# IN THE COURT OF APPEALS OF TENNESSEE
## AT JACKSON
April 9, 2024 Session

## HEATHER DANIELLE RADER BLOUNT v. JAMES EDWARD BLOUNT

**Appeal from the Circuit Court for Shelby County**
**No. CT-005694-18  Yolanda Kight Brown, Judge**

_____

### No. W2022-01722-COA-R3-CV
_____

This is an appeal from a three-day divorce trial in which both parties presented expert testimony regarding how to calculate the husband's income for purposes of paying support. The husband raises nine issues on appeal regarding proof of marital fault, the valuation of marital property, and the alimony and attorney fees awarded to the wife. For the following reasons, we vacate in part and affirm the decision of the trial court as modified.

**Tenn. R. App. P. 3 Appeal as of Right; Judgment of the Circuit Court Vacated in Part, Affirmed as Modified, and Remanded**

CARMA DENNIS MCGEE, J., delivered the opinion of the court, in which ANDY D. BENNETT, J., and J. STEVEN STAFFORD, P.J., W.S., joined.

Rex L. Brasher, Memphis, Tennessee, for the appellant, James Edward Blount.

Lori R. Holyfield, Munford, Tennessee, for the appellee, Heather Danielle Blount.

## OPINION

### I.  FACTS & PROCEDURAL HISTORY

James Edward Blount ("Husband") and Heather Danielle Blount ("Wife") married in 1999, when both parties were 27 years old. Wife had a master's degree in education and a minor in psychology, and she had been teaching at a public elementary school in Memphis. Husband had a law degree and was working with his father, who was also an attorney, at the Blount Law Firm, a general litigation and personal injury practice started by Husband's grandfather. Wife continued working as a teacher for the first year of the marriage but then quit working when she became pregnant with the parties' first child. The

parties would ultimately have three sons born during the marriage, in 2001, 2002, and 2004, and Wife was a homemaker during that period of time. In 2005, the parties purchased a home for $398,000. In 2006, Wife went back to work as a teacher at the private Christian school where the parties' oldest son was attending. Wife's salary averaged around $30,000, but her employment greatly benefitted the family because she received a fifty percent discount off private school tuition for the three children and provided health insurance for the family.

Around the same timeframe when Wife went back to work in 2006, Husband's father decided to move the Blount Law Firm's office from Memphis to Collierville. He purchased an old farmhouse in Collierville that needed renovation. This move would ultimately have a negative impact on the law practice. Due to unforeseen expenses and delays with the renovation, and the lack of a client base in Collierville, the firm's business decreased after the move. Husband and Wife refinanced their mortgage loan for $400,000 and began making interest-only payments. Around 2009 or 2010, Husband's father realized that the move was a mistake and put the building on the market, where it would remain for nearly a decade. Husband's father died in 2011. The bank note on the Collierville property led to additional financial struggles for Husband thereafter. The lender threatened to foreclose if Husband did not refinance. He was eventually able to obtain financing through another bank, but then he had "a huge note" on the property. In addition, the ongoing expenses to maintain the property were very high. The Collierville property remained on the market throughout this time, with Husband hoping to keep it out of foreclosure until he could find a buyer. For several years during this timeframe, Husband and Wife did not pay income taxes to the Internal Revenue Service, as they used the money to pay the office and household expenses instead.

The parties' financial situation got even worse around 2017, when their period of making interest-only payments on their mortgage ended and the principal payments "kick[ed] in." The interest-only payments had been about $1,375 per month, and the new payment amount was around $3,400 per month. In addition, the annual tuition per student at the children's private high school (prior to any discount) was over $17,000. Husband suggested that the parties send the children to a nearby public school to relieve some of the financial burden on the family, but Wife refused. Their oldest son began his senior year of high school in August 2018.

Also in August 2018, Wife began having an affair with an old friend from grade school with whom she had recently reconnected via social media. She began traveling to Knoxville to stay with her paramour, while telling Husband that she was going to visit family members there. Eventually, however, Husband discovered Wife's affair. Wife informed Husband of her desire to get a divorce and stated that the primary reason she wanted a divorce was due to their financial issues. Husband was offered a job at a bigger law firm during this period and decided to take the job in an effort to save his marriage, given that he had been unable to sell the Collierville building and was struggling

financially.  Husband did very minimal work for the new firm in late 2018 but would "really start[]" in January 2019.  On December 20, 2018, however, after nineteen years of marriage, Wife filed a complaint for divorce, alleging inappropriate marital conduct and irreconcilable differences.  She sought to be named primary residential parent and asked that Husband be ordered to pay child support and alimony.  One week later, on December 31, 2018, Husband finally sold the office building in Collierville.

In January 2019, Husband began working for the other law firm with a special arrangement that permitted him to continue operating the Blount Law Firm.  The Blount Law Firm no longer had a physical office, but Husband maintained all of the state filings for the PLLC, maintained the firm's website and phone number, and continued advertising.  Husband's contract with the other firm provided that his percentages of the total fees recovered on cases differed based on whether the case was brought in through his own efforts or through the other firm.  Husband would receive a larger percentage on cases that he brought in through the Blount Law Firm.  In addition, he was permitted to keep cases that originated with the Blount Law Firm before he joined the other firm, so he designated certain cases as exclusively belonging to the Blount Law Firm.  Husband worked on those cases as he saw fit and did not have to pay the other firm any of the fees he recovered on those designated cases.

Wife had remained employed as a teacher at the private Christian school where the parties' children attended for the past thirteen years, but it was a violation of the school's code of conduct for her to file for divorce.  The crux of the issue was whether Wife had an inappropriate relationship with someone.  After a meeting, she and the school administrators came to a "mutual decision" that she would not return for the next school year.  Thus, Wife ended her employment at the school in May 2019.  In addition to losing Wife's annual salary of $33,378, the family also lost the tuition discount and their health insurance.  Beginning in March 2019, however, Husband began receiving attorney fees from the resolution of two large class action lawsuits that he had been working on for many years, which he had retained as cases belonging exclusively to the Blount Law Firm.  For one of those cases, Husband received $288,404 in attorney fees (received in three payments over two years).  For the second case, he received $421,863 in attorney fees and expenses.

In the meantime, Husband filed an answer and counter-complaint for divorce, asserting irreconcilable differences and that Wife was guilty of inappropriate marital conduct and adultery.  He sought to be named primary residential parent and requested an award of alimony.  Wife filed a motion for pendente lite alimony, child support, and attorney fees.  In December 2019, a consent order was entered providing that Husband would continue to pay all household expenses that he had traditionally paid, which encompassed everything except the water bill for the marital home.  The order stated that Husband was now also paying for health insurance for the family.  Husband, Wife, and the parties' children continued to reside in the marital home throughout this period, with Husband living in the playroom.  Another consent order was entered, which stated that the

- 3 -

parties would take the necessary steps for the children to continue attending the private Christian school and pay the tuition with marital funds. According to Husband, the Blount Law Firm received the proceeds from the sale of the Collierville office building in 2019, totaling around $280,000, which, combined with the class action fees, enabled him to pay for the tuition and all of these expenses for the family.

In August 2019, Wife began working at another private school, where she was paid around $30,000 per year. When the Covid-19 pandemic began in early 2020, the school transitioned to online classes. According to Wife, she was not sure what was going to happen for the fall semester and started to reevaluate her options during the summer. Wife decided that the insurance industry was "a good path" and became licensed to sell various types of insurance. In October 2020, she began working at State Farm.

In November 2020, Wife filed a motion for injunctive relief, asking the trial court to remove Husband from the marital residence and award her exclusive use of it, noting increased tension in the home and that Husband was in a romantic relationship as well. Although Husband initially opposed the motion, he agreed to vacate the marital residence by December 1, 2020. Husband began renting a home in Cordova and paying the additional expenses associated with furnishing and maintaining a separate residence. In February 2021, Husband filed a motion to require the sale of the marital residence. He asserted that the tax appraisal of the marital home was only $387,800, the mortgage balance was $361,000, and the IRS had an income tax lien on the home for the sum of $152,000. Husband claimed that the monthly mortgage payment was $3,555 with insurance and the HOA dues. Thus, he argued that the cost of maintaining the marital home was "unnecessarily exorbitant" and draining the family's resources, when the little equity that existed would be seized by the IRS in any event. Wife opposed Husband's motion to sell the home, arguing that he had plenty of money and that the issue could be addressed at the upcoming trial date. In response to another motion for pendente lite support, Husband agreed to also pay Wife cash in the sum of $275 per week.

In February 2021, Husband tendered his resignation to the other law firm, and his last day working there was March 3, 2021. Husband then resumed working exclusively for the Blount Law Firm. In May 2021, the parties' middle son graduated from high school, leaving only the youngest in private school.

The parties' divorce trial began on June 29, 2021, and it lasted three days. By the time of trial, both parties were 49 years old and in good health, and they had been married 21 years. Wife continued to reside in the marital home with all three of the parties' sons, although two of them had reached the age of eighteen and would be living elsewhere once college started in the fall. The youngest son was about to start his junior year of high school. Husband had only been working full-time for the Blount Law Firm for three months, and Wife had left her employment with one insurance agent and gone to work for another agent with State Farm just two months before trial. Thus, determining the parties'

- 4 -

incomes was a difficult matter. Both parties presented expert witnesses regarding how Husband's income should be calculated and agreed that it was the biggest issue before the court. Wife sought an award of alimony in futuro of $5,000 per month in addition to transitional alimony of $1,000 per month until the sale of the marital residence. Husband claimed he could not afford to pay any alimony given the amount he had expended on support for the family during the divorce proceeding and the amount of marital debt he proposed to assume after the divorce.

Wife testified that she had "ma[d]e a sacrifice" by working at the private school throughout the marriage because she could have been making more money at a public school, but her "primary concern" was the children. She said she had desired to leave her employment at the private school during the marriage because she "wanted to do something else" and "just wanted something different," but she did not want the children to be removed from the school. Wife also explained that the private school did not require a teaching certification, so she did not maintain her teaching license while employed there and would have to test again in order to renew it. Rather than taking the steps to reactivate her teaching license, Wife "just looked elsewhere." She testified that she was currently working for State Farm at "a base salary of 24,000 plus commission." When asked about her decision to leave the field of education for this job, given her master's degree in education, she testified that she had the potential to earn more money in the insurance industry. She explained that she "had probably hit the maximum I was going to make, roughly around 30,000," as a teacher, but she had "the opportunity to make past that 30,000" at her new job. She explained that she would be earning bonuses and commissions beyond her base salary. Wife noted that when she was employed with the previous insurance agent, she was told that she would be making between $45,000 and $60,000 in her first year of selling insurance. However, Wife said that agent was not doing the things he had promised so she was "going nowhere" and decided to leave when she had the opportunity to take a position with a higher base salary. When asked if she could earn the same projected amount of $45,000 to $60,000 in her first year with her current agent, Wife said she did not know, but that she was putting in all the time and effort she could. She testified that she was "still learning," but she "definitely" intended to continue selling insurance. Still, she stated that her earning capacity would never be close to that of Husband.

Wife testified that she was willing to stipulate to grounds for divorce, but Husband was not. She believed both parties were equally entitled to a divorce because both had engaged in wrongdoing. She testified that the biggest problem the parties had during the marriage was related to money. Wife said she did not know how much money Husband made, but she "was generally told we never had money." She described several occasions in which her debit card was declined or the parties' utilities were turned off. Wife said she had begged Husband for years to give up the Collierville office building that his father had purchased because it was "sucking the life out of us" and to get a job at another firm where he would have a dependable paycheck. Wife conceded that she began an inappropriate

relationship with her paramour but claimed the marriage was already "beyond repair" at that point.

As for the standard of living during the marriage, Wife described it as middle class. They employed a housekeeper "[o]ff and on" and purchased two boats during the marriage. Wife also testified that Husband had a Peloton bike and several expensive bikes and related clothing, and he had his suits tailor-made. She conceded that she had taken trips with her paramour and spent money on hotel rooms, gas, and food. She also acknowledged that she and her paramour had discussed marriage and her moving to Knoxville, but she testified she would not leave until the youngest son graduated from high school.

When asked about Husband's request to sell the marital home, Wife testified that she did not want to sell the house until the youngest son graduated from high school in May 2023 because he suffered from anxiety. Wife sought child support of $2,100 per month and retroactive child support from the date when Husband vacated the marital residence. However, she acknowledged that Husband had been paying all expenses for the household except the water bill and gas for her vehicle. Wife had just leased a new vehicle, a 2021 Infiniti QX50, and Husband was paying the majority of that payment with Wife only "mak[ing] up the difference" in the cost for the new vehicle. He was also paying Wife $275 per week for "support."

Wife submitted an affidavit of income and expenses, showing that she earned a gross monthly income of $2,339.15 from State Farm ($28,069.80 annually). After withholdings, she had a net monthly income of $2,019.59. She listed her total monthly expenses anticipated after the divorce at $7,767 (with an additional $1,000 in expenses until the marital residence was sold). Wife claimed a monthly deficit of $5,747.41. She also claimed an inability to pay her attorney fees, which exceeded $75,000. At least $22,637 of her fees and expenses had already been paid with marital funds.

Husband was the only other witness to testify besides the expert witnesses. He testified that he and Wife were getting a divorce because of her affair and that he was originally opposed to getting a divorce. When asked by his counsel how he discovered Wife's affair, Wife's attorney objected on the basis of relevancy, arguing that Wife had already admitted to having the relationship. In response, Husband's counsel argued that it was relevant to the issue of inappropriate marital conduct. The trial court ruled that this questioning was not relevant because Wife had already admitted to the relationship, so the court advised counsel to "move on from it." Husband was then asked whether he had "hope" for his marriage even after he found out about the affair. Again, Wife's counsel objected on the basis of relevancy, noting that both parties wanted a divorce. The trial judge stated that unless there was some relevance to an issue involving the child, she did not want to spend time on something that was unnecessary. Husband's counsel responded, "I understand. Your Honor, I'll just move on. That's fine. I'll move on." Husband went on to testify that Wife paid for any trips she took with her paramour with marital funds because

- 6 -

she did not have any separate property. He testified that he never had an affair while the parties were together and that he did not begin his current relationship until after he read the deposition of Wife's paramour in May 2020. However, Husband admitted to spending marital funds on his paramour as well.

Regarding his work history, Husband testified that he began working for the Blount Law Firm when he was in college. He joined the firm once he earned his law degree and maintained a general litigation practice doing primarily personal injury work throughout the parties' marriage, even after his father died. He said his employment situation only changed in late 2018 when he was "trying to save [his] marriage." Husband explained that he was offered a job at the other firm at a point when he had no purchaser for the Collierville building and Wife had just informed him that she wanted a divorce primarily due to their financial issues. He said he decided to try working at the other firm in an effort to resolve his financial issues so Wife would want to stay married. He was placed "on counsel" in late 2018 and did very minimal work for the other firm but really started working there in January 2019, although he also kept the Blount Law Firm open "on paper" and continued his advertising efforts. Husband received W-2's from the other law firm showing that he earned $678 in 2018; $126,067 in 2019; and $214,121 in 2020.

Husband testified that he tendered his resignation to the other firm in February 2021 and ended his employment there on March 3, just three months before trial. He explained that the work environment was miserable at the other firm because it was a very high volume practice that he "was not accustomed to" after practicing for twenty years at the Blount Law Firm. Husband was an associate attorney at the other firm and was expected to handle between 200 and 300 cases at a time. He testified that he simply could not keep up with that demand. He explained that his emotional state had suffered because of the divorce, and it was hard for him to focus on his work and handle that type of workload, so he feared that he was going to commit legal malpractice. When asked if he was presently working fulltime, Husband said, "I try to, yes[.]" He said that he had cases and clients. He explained that he was initially practicing out of his house because, at that point in early 2021, the Covid-19 pandemic had made it difficult to meet with people in person and he really did not need to bear the expense of maintaining a separate office space at first. However, Husband had just leased an office space in a commercial building about a month before trial at a cost of $875 per month.

Husband agreed that the youngest son should finish his high school education at the private school, and he was paying the tuition payment of $1,600 per month. However, Husband noted that the loss of Wife's employment at the school had greatly increased the parties' expenses for tuition and added a new cost for health insurance. Although Wife eventually secured other employment, he said she had not used any of her earnings to pay for tuition. Husband also explained that pursuant to the 2019 consent order, he was still paying "basically all the household expenses except for the water bill[.]" He testified that his receipt of the proceeds from the sale of the Collierville office and the attorney fees from

the two class action lawsuits enabled him to pay all of these expenses during the divorce litigation. For instance, he testified that the money from the sale of the Collierville office was spent on taxes, tuition, purchasing a vehicle for the parties' son, and the household expenses, so none remained at the time of trial. Husband said he was concerned about his ability to continue paying such expenses going forward because his income from his law practice was not consistent and he worried about shortfalls occurring in the future. He also noted that the parties owed the IRS $195,288 for tax years dating back to 2010. Husband and Wife had jointly filed income tax returns for tax years 2015 through 2019 through an accountant. He had not yet filed his tax return for 2020. Husband testified that the net income shown on the parties' tax returns for 2015 through 2018 was representative of the average he earned throughout the marriage. He described their standard of living as "more than we could afford." He agreed it was middle class but reiterated that their financial situation was "[p]recarious."

Husband testified that the two large attorney fee awards he received beginning in 2019 were from class action lawsuits he had worked on through the Blount Law Firm for many years, and he was finally able to recover on those during the divorce proceeding. The first class action suit, referred to as the "Methodist" case, was originally filed in 2007. Husband had served as counsel on it since the day it was filed and worked on the case over fourteen years. The fee of $408,735 (plus expense reimbursement) was received in November 2020. Husband submitted as an exhibit at trial the joint declaration of class counsel that was filed in support of the fee award, summarizing the amount of time and effort put into the case over the years of litigation. He also submitted the docket report for the case as an exhibit, showing the various pleadings and orders that were filed over the years. He testified that he did most of the work on this case and that it consumed much of his life for 13 years. The second case, called the "Cemetery" case, was also a class action lawsuit. The total fee awarded in this case was $288,404, but it was received in three payments from multiple defendants rather than all at once. Husband had worked on this case for five years and again said he "did a huge amount of work," filing motions, taking depositions, attending all hearings, and sitting through a month of trial. He explained that these were not contingency fee cases and that the courts had approved the fee amounts based on various factors. When asked if this type of large class action fee was regularly received by the Blount Law Firm, Husband said, "No, not at all." He noted that these were the only two class action lawsuits that he had been involved in. He had never received individual fees of this type and magnitude at any point in his career, although he acknowledged working on one case with his father with a "pretty good recovery." He testified that he currently had no cases for which he had any reasonable expectation of receiving fees of that magnitude.

Husband also submitted a statement of his income and expenses. For reasons that will be explained in greater detail below in our discussion of the expert testimony, Husband calculated his average monthly gross income over a five-year period at $16,762. After deducting the estimated amount of his taxes, he calculated his net monthly income at

$12,571. He listed anticipated monthly expenses of $10,839.30. This would leave Husband with $1,731.70 remaining. However, Husband noted that he was currently also responsible for paying the mortgage on the marital residence, which was over $3,000, in addition to a monthly payment of $535 toward the parties' past due taxes, pursuant to an agreement the parties negotiated with the IRS in 2019. With these two current expenses included, Husband was at a monthly deficit of $1,938. He testified that the 2019 consent order also presently required him to pay all household expenses for the marital residence except the water bill, which included home repairs, utilities, housekeeper, health insurance, Wife's car note, auto insurance, taxes, vehicle expenses for the children, medical expenses, etc., and he was also paying for the groceries until he started paying $275 per week directly to Wife three months before trial. Husband explained that he had continued paying these expenses pursuant to the 2019 consent order even after he vacated the marital home in December 2020, which created new expenses for his own rent, utilities, insurance, etc. He stated that he was simply unable to continue making all these payments because it was "too much" and he could no longer support two separate residences. He noted that he had paid all of the expenses during the divorce litigation through his income from the Blount Law Firm, the other firm, and the two large fee awards he received. However, he reiterated that the funds were used on private school tuition, cars for the children, his business expenses, and living expenses for the family, adding, "everything that's been paid has been paid out of those funds." He was not aware of any financial contribution that Wife had made to the household or living expenses, aside from the water bill, for the past three years.

The parties' only assets of significant value were two cemetery plots valued at $12,000, Husband's pickup truck valued at $15,000, two boats valued at $12,000 and $9,000, Wife's retirement account valued at $82,439, an IRA valued at $3,907, and Husband's law firm operating account, which had a balance of $45,000. Because the marital home had little equity and was subject to tax liens, Husband repeated his request for the trial court to order the sale of the house because the parties simply could not afford the extra expense of maintaining it. He testified that the youngest son was "more resilient than his mother gives him credit [for]" and "made himself comfortable" when staying at Husband's rental house.

Husband had already paid a portion of Wife's attorney fees and proposed that each party be responsible for their own remaining fees in light of the fact that Wife was the reason the parties were getting a divorce. He testified that he had also paid $35,000 to $45,000 for his own attorney fees, $18,000 for his own expert witness, and $5,000 for Wife's expert. He testified that there was no way he could afford to pay his own attorney fees in addition to hers. He did agree to assume essentially all of the other debt associated with the marriage, including the IRS debt. Husband agreed to pay child support but did not believe that he should be required to pay alimony.[1]

---

[1] During cross-examination, Wife's counsel asked Husband if his counter-complaint for divorce had requested alimony. Husband conceded that it did but said he did not really understand the significance

- 9 -

Wife had engaged Michael Pascal, a certified valuation analyst, to prepare a financial forensic report of Husband's income for support purposes. To begin his testimony, Mr. Pascal summarized his professional opinion that when making a determination regarding variable income in support cases in Tennessee, it is appropriate to record the income when it is received, because that is when the income is "earned," and then the trial court has discretion to average the individual's variable income over a period of years. As support for his opinion that income should be "based on the year in which cash payments are received," Mr. Pascal cited the definition of a "contingent fee" from "Law.com." On the issue of averaging, Mr. Pascal cited one particular case from the Tennessee Court of Appeals that had been remanded for a trial court to set child support "by averaging [the parent's] income in the number of years determined by the trial court to be the most appropriate for predicting future income[.]" *Smith v. Smith*, No. M2000-01094-COA-R3-CV, 2001 WL 459108, at *13 (Tenn. Ct. App. May 2, 2001).

Applying this approach to Husband's income, Mr. Pascal first opined that the sum of $421,863 he received from the Methodist case should all be attributed to the year 2020 and included in Husband's income for that single year. For the Cemetery case, Mr. Pascal similarly attributed all of the income to the years when the fees were received, totaling $288,404 in three amounts received between March 2019 and March 2021. He acknowledged that the cases had been filed in 2007 and 2014 and that Husband had "spent some initial time and money filing" the cases, but he maintained that "the contingent attorney fees were not earned until the cases were resolved." Thus, Mr. Pascal included all of the class action fees as income to the Blount Law Firm in the years received, then reduced that annual revenue by the firm's operating expenses, and added back depreciation, to reach an "adjusted total" income for the Blount Law Firm. For 2018, the year before the divorce, that adjusted total income was $95,644. However, for 2019, Mr. Pascal calculated the firm's income at $142,041, and for 2020, he calculated it at $464,296. Next, Mr. Pascal added Husband's W-2 income from the other firm to his income from the Blount Law Firm during the applicable years. Using these combined figures, Mr. Pascal calculated Husband's 2019 total income at $268,108, and his 2020 income at $678,417.

To determine Husband's income for purposes of child support and alimony, Mr. Pascal proposed averaging Husband's income over either two years (2019-2020) or three years (2018-2020). The two-year average for 2019 and 2020 equated to annual income for Husband of $473,263, or $39,439 per month. The three-year average equated to annual income of $347,616, or $28,968 per month. As an alternative, Mr. Pascal suggested an even higher number if the trial court determined that the deduction Husband took on his

---

of that request in the complaint because he is not a divorce attorney. Husband's counsel then objected and stated that Husband was not seeking an award of alimony and had never requested it beyond boilerplate language in his original filing.

tax return for "cost of goods sold" in 2019 was not supported by sufficient proof.[2] In that case, Mr. Pascal calculated Husband's income at a two-year average of $516,144 annually, or $43,012 per month, and for three years, $376,203 annually or $31,350 per month. (Wife's proposed child support worksheet utilized this amount, listing Husband's gross monthly income as $43,012.) Mr. Pascal testified that a two-year average was most appropriate in this case. He opined that two or three year averages are more indicative of current and prospective income while four or longer would get further away from "prospective income." Mr. Pascal noted Husband's deposition testimony that he had "a whole bunch of work to do" when he worked for the other firm, and still did, so Mr. Pascal concluded that Husband "has the ability to earn this income going forward." He said he found no basis for Husband's claimed income of around $16,000 per month. Overall, Mr. Pascal suggested that his report was "a reasonable reflection" of Husband's income, but if the court found a higher number, that would not be unreasonable.[3]

On cross-examination, Mr. Pascal acknowledged that language he relied on in the *Smith* case discussed averages of two to four years "because that was the scope of the proof that was offered" in that particular case. When asked about another case stating that variable income should be averaged over as long a period as circumstances permit, Mr. Pascal said he had not read the case and questioned what was meant by the phrase "as the circumstances permit." Regarding his decision to include all of the attorney fees from the class action suits in the years they were received, Mr. Pascal reiterated his opinion that "for support purposes, when you receive the money is when it's earned." He said he did not see any records showing when the work was done, but even assuming that Husband worked on a lawsuit for years, Mr. Pascal would record all the income when it is received. He said the IRS also views income as earned when it is received. Mr. Pascal acknowledged that the "primary difference" between his report and the one prepared by Husband's expert was their treatment of the two class action fees, as Husband's expert proposed spreading or averaging the fees from the two suits over the years since they were filed and attributing a portion of the fee to each of the years the case was pending. Mr. Pascal criticized this approach, stating that Husband and his expert "provided no evidence that any substantial

---

[2] Mr. Pascal explained that he questioned the deduction of $85,763 on Husband's tax return for "cost of goods sold" in 2019 because a law firm does not sell inventory or have a cost of goods sold. When asked about this deduction in his deposition, Husband deferred to his CPA. Finding no support for the deduction, Mr. Pascal proposed adding the amount back.

[3] Mr. Pascal also testified that he had reviewed the deposits into Husband's law firm operating account and determined that they were higher than what he reported as income on his tax returns on Schedule C. He said that Husband's CPA was asked to produce his work papers regarding how he determined the firm's gross revenue and did not provide them. Consequently, Mr. Pascal suggested that Husband's reported income on his tax returns was not accurate and was much less than what was "actually received" by him. For example, he stated that in 2018, Husband's Schedule C showed income of $216,227, but his Quicken report showed $377,133, and his deposit detail showed $459,072. Mr. Pascal said he ultimately decided to use the tax return amounts in his calculations to be "conservative," but he simply noted these discrepancies to show that his income averages would have been higher if he had utilized the other figures.

legal work was done beyond the initial filing until the resolution of the case." He also noted that such an approach would utilize averaging the two fees in addition to averaging Husband's income over a period of years, resulting in "averaging on averaging" and "further diluting income."

Mr. Pascal conceded that he was not aware of any other class action lawsuits that Husband had "in the pipeline." Still, he suggested that such suits might be "required of him" in the future. When asked if he had any basis to believe that Husband would earn fees of that nature in 2021 or 2022, Mr. Pascal responded that he had no basis to know that he would *not*. He stated that Husband is "in the business of class-action suits, personal injury suits," and "could just as easily make it as not make it." However, he admitted he was not aware of Husband serving as counsel on any other class action lawsuits. Husband's counsel questioned Mr. Pascal about his decision to attribute a *monthly* income to Husband of over $39,000 when he calculated his income in 2018, just before the divorce, at roughly $96,000 for the entire year, or $8,000 per month. Mr. Pascal admitted the accuracy of these figures for 2018 but emphasized that his approach looked at a two-year average, using only 2019 and 2020, and it was higher because of the two class action fees. When asked about prior years, however, Mr. Pascal calculated Husband's 2016 income from Blount Law Firm at $83,941 and his "income for support purposes," with depreciation added back, at $98,836. For 2017, he calculated net income from his law practice at $89,258 and his income for support purposes at $96,471. Thus, Mr. Pascal conceded that Husband had earned less than $100,000 in each of the three years prior to the divorce. Mr. Pascal again noted that his analysis did not use those years.

Finally, the trial court heard testimony from Husband's expert, Cynthia MacAulay, who was a certified public accountant, certified in financial forensics, certified valuation analyst, and certified divorce financial analyst. She testified that she was asked to analyze Husband's income and look at his ability to pay child support. Ms. MacAulay testified that the income for the Blount Law Firm from 2015 through 2018, the years before the divorce, ranged between $75,000 and $89,000 based on the tax returns.[4] Her approach to allocating the class action fees, which Husband started receiving in 2019, differed from that of Mr. Pascal. She divided the sum of $421,863 received in the Methodist case by the thirteen years the case was pending so that $30,868 of the fee was allocated to each year between

---

[4] Ms. MacAulay was asked about the difference between Husband's deposits and his tax returns. She had reviewed the tax returns, bank statements, business records, and Quicken detail and prepared various calculations and scenarios using those figures. However, she did not believe that the deposits were reflective of Husband's true income. Ms. MacAulay explained that Husband prepared his own Quicken entries and that there were several "transfers back and forth" from his IOLTA account that were put into his operating account and then "put back" or "backed out." She also noted that he had started using the account for personal expenses. Thus, Ms. MacAulay did not believe the deposit detail was a reliable source of information regarding his income and believed this explained the differences on the tax returns. She believed the tax returns provided a more accurate calculation of Husband's income and noted that Mr. Pascal chose to use the tax return figures in his report as well.

- 12 -

2007 and 2020. She used the same procedure for the Cemetery case, allocating the total fee of $288,404 over the number of years the case was pending back to 2014, for a total of $52,360 assigned to each of those years. Accordingly, for the years when both class action lawsuits were pending, Ms. MacAulay added $83,228 to Husband's other income for each of those years. She testified that it was appropriate to average the fees in this manner for several reasons. She explained that this was not income regularly received, as Husband had not worked on any other class action lawsuits, and these two cases lasted for lengthy periods of about thirteen and six years. She noted that he did not have any similar cases "going forward." Ms. MacAulay did not believe it was appropriate to include all of the income when received because that approach did not represent what Husband had made historically. Thus, she allocated the fees over the life of the case.

In calculating Husband's income for each year, she had also deducted the operating expenses and the cost of goods sold and added back depreciation. Ms. MacAulay had also added Husband's W-2 income from the other firm. Thus, Ms. MacAulay calculated Husband's total gross income for recent years as follows: $165,920 in 2015; $182,064 in 2016; $179,699 in 2017; $179,550 in 2018; $154,617 in 2019; and $309,817 in 2020. After calculating this annual income, Ms. MacAulay explained that she still found it appropriate to consider an average of Husband's income because it varied from year to year. She calculated two different options, explaining that when someone's income varies from year to year she typically uses a three to five year average depending on the facts of each case. Looking at five years, from 2016 through 2020, Ms. MacAulay calculated Husband's average annual income at $201,149, or $16,762 per month. Alternatively, using a three year average from 2018 to 2020, she calculated his average annual income at $214,661, or monthly income of $17,888. Ms. MacAulay opined that the five year average was the most appropriate in this case because two of the most recent years were "extraordinary years" and should not, in her opinion, constitute two out of the three years considered.

Ms. MacAulay testified that she had not often used a two year average in her experience, but she might opt to do so if, for example, considering additional years would not show "a reasonable basis of what [the individual's] income is going to be going forward." She opined that Mr. Pascal had no reasonable basis for using two years when the two he selected did not reflect Husband's regular income. She said those two years involved two "extraordinary cases" that "were not typical." She emphasized that the reason the experts were trying to figure out Husband's income was to determine his ability to pay child support and alimony. Ms. MacAulay explained that if you took 2019 and 2020 "off the table" and forgot about those years because of the two large fee awards he received, the remaining years would show Husband's "regular income." She opined that his income from 2015 to 2018 was more indicative of "what his regular income would be," around $8,300 per month, and yet Mr. Pascal suggested calculating his income as high as $43,000 per month. Aside from when he received the class action awards, Ms. MacAulay was not aware of any point historically when Husband had received such income, and she did not expect him to receive it going forward.

- 13 -

Considering Ms. MacAulay's five-year average of Husband's monthly income at $16,762 per month, she estimated that he would owe taxes of $4,191 per month, leaving a net income of $12,572 per month. At the time of her calculation, Husband had claimed expenses of $15,176 per month. She also calculated that he would owe child support of $1,711 per month. Ms. MacAulay concluded that this resulted in a monthly deficit for Husband of $4,315, with no consideration of any alimony award. She noted that a recent change to the mortgage payment since her report would alter this amount by approximately $670, but in any event, Husband was still "running a deficit" using either figure. She further noted that Husband's five-year average net income of the Blount Law Firm *without* considering the two class action fees or his W-2 income from the other firm was only about $13,000 per month. She said that a five year average without the two large fees but with the W-2 income from the other firm was about $19,000 "before taxes."

At the conclusion of the three-day divorce trial, on July 1, 2021, the trial judge took the matter under advisement. She stated that the parties were welcome to submit proposed findings of fact and conclusions of law if they desired to do so, but it was not required. In August 2021, Husband submitted proposed findings of fact and conclusions of law. When no final order was forthcoming by November, Husband filed a petition to modify the orders on temporary pendente lite support. He stated that he was still paying all the bills for the marital residence, Wife's car note and insurance, health insurance, boat expenses, and private school tuition, which he calculated as totaling $7,240 per month, not to mention his own expenses for his residence. He noted that when the 2019 consent order was entered, he was still residing at the marital residence and Wife was still working as a teacher with a lower earning capacity. He also pointed out that the calculations of his income at trial included the two class action suits and was not consistent with the income he earned during the marriage or in the months since the trial ended. Thus, Husband contended that he could no longer pay the amount of pendente lite support previously ordered, and he asked the trial court to reduce or terminate his obligation. On the same date, Husband also filed a motion to set a status conference "so that the parties may know when to expect a final ruling."[5]

The record does not reflect any action taken on Husband's petition to modify the support order in the months that followed. In January 2022, Husband's counsel moved to withdraw, and the trial court granted the motion. In February 2022, Husband filed a pro se "Motion to Render Decision." He noted that the divorce trial ended seven months earlier, on July 1, 2021. He cited Tennessee Code Annotated section 20-9-506, which provides, "When any judge of any district tries a case without the intervention of a jury, whether the

---

[5] Thereafter, Wife filed a petition for scire facias and citation for civil contempt, asserting that Husband had canceled the cable television service at the marital home and owed $3,000 for uncovered dental expenses, $1,000 for a school trip for their son, over $5,000 on the mortgage, and various other expenses. She asked the court to incarcerate and/or fine Husband until he purged his contempt.

judge is required to reduce the judge's finding of facts to writing or not, the judge shall be required to render the judge's decision and have judgment entered in the case within sixty (60) days from the completion of the trial." He also cited a Tennessee Supreme Court Rule providing that no case may be held under advisement in excess of sixty days absent the most compelling of reasons. Tenn. Sup. Ct. R. 11, § III(d). Thus, Husband "respectfully request[ed]" that the trial court render its decision.

On March 2, 2022, the trial court issued "Conclusions of Law and Findings of Fact," setting forth the trial court's rulings and directing the parties to prepare a final divorce decree and permanent parenting plan consistent with those findings and conclusions. Therein, the trial court found that both parties were entitled to a divorce and declared them divorced. Regarding Wife's earning capacity, the trial court found that she "voluntarily decided to leave her job" in the education field, as there was some uncertainty after Covid-19 but the school had transitioned to virtual learning and there was no proof that she was in jeopardy of being terminated. The trial court also found that Wife could have taken steps to renew her teaching certificate to teach in public schools, as she noted during her testimony that she could have made more money at a public school. The trial court acknowledged that Wife had "secured employment that has the potential to earn at or more than what she made as a teacher," but it found that her decision to leave the second private school was not reasonable in light of the parties' financial circumstances and her obligation to support her child. Therefore, the trial court found Wife voluntarily underemployed. However, the trial court imputed income to Wife only at the level of her income at the private Christian school where she worked during the marriage, stating that this was "a good indicator of her earning potential and not the speculative amount of what she could possibly earn at some point in the future."

Next, the trial court addressed Husband's earning capacity. Regarding the fees from the two class action lawsuits, the trial court adopted Mr. Pascal's approach of assigning them all to the years in which they were received. The court noted the testimony of Ms. MacAulay that the fees should be spread out over the lifetime of the cases because this income was not regularly received, Husband worked on the cases for 13 and 6 years, he did not have any other class action suits, and the fees did not represent his historical income. The trial court agreed that "[t]hese two cases do not represent fees incurred regularly." It found that there was "no proof presented as to Husband having similar cases in the pipeline, [and] no proof refuting Husband's contention that outside of these two cases, the only other good recovery was on a case in 2010." Still, the trial court noted Mr. Pascal's reliance on the definition of a "contingent fee" and the fact that it is not earned until the case is resolved. The trial court stated that it was unable to accept the conclusion of Ms. MacAulay and was instead "persuaded by Pascal's opinion that fees are earned at the time they are received based on the definition of contingency payments that are due and payable only if there is a successful conclusion of the legal work[.]" It found that "[a]veraging the fees earned over the life of the case until the fees are paid is not appropriate as they were not yet earned and dilutes the income and especially in light of the fact that no proof was

- 15 -

provided as to what time Husband spent on the case for each year since each case was filed."

Next, the trial court proceeded to calculate Husband's income for each year.[6] Regarding the "cost of goods sold" deduction taken by Husband in 2019, the trial court recognized that Mr. Pascal questioned the deduction because "attorneys don't sell inventory" and Husband failed to provide support for it when requested. The court noted that Husband sold his office building at the end of 2018, worked primarily for the other firm in 2019, and presumably would not have had major overhead or expenses. The trial court rejected Husband's suggestion that the amount was "probably operating expenses" instead of cost of goods sold. Because Husband failed to supply the necessary information to verify his position, the trial court declined to consider the deduction and added the amount back to Husband's income. Thus, for each year, the trial court calculated the income of the Blount Law Firm, deducted operating expenses, and added Husband's W-2 income from the other firm for the years it was earned. The trial court listed its calculations of Husband's annual income as follows: $83,941 in 2016; $89,258 in 2017; $89,779 in 2018; $344,348 in 2019; and $668,894 in 2020.

Finally, the trial court considered the issue of averaging Husband's variable income. It noted Ms. MacAulay's testimony that three or five years should be used while Mr. Pascal opined that two or three years was appropriate. The trial court said that it had accepted Mr. Pascal's opinion on other issues but did not "to the extent that he averages over 2 or 3 years as he has no factual basis for his opinion that Husband will make the same in 2021 or 2022 and Husband's income has varied from 2015-2019." The trial court utilized a five-year average and calculated Husband's average annual income at $255,244, or $21,270.33 per month.[7]

Considering these figures in its discussion of the relevant statutory factors, the trial court proceeded first to divide the marital estate. The trial court calculated the total value of the marital assets at $611,294.98 and the marital debts at $548,744.60. Omitting the assets allocated to the children, the trial court divided the marital estate as follows:

_____

[6] The court found Mr. Pascal's testimony persuasive regarding the gross receipts reflected on Husband's tax returns being unreliable when compared with the firm's deposit details and Quicken records. However, like Mr. Pascal, the trial court ultimately decided to "take the conservative approach" and utilize the income reported on the tax returns in its calculations.

[7] For comparison, the court noted that this amount was "approximate" to the amount calculated if the court added Husband's average annual W-2 income at the other firm ($170,094) to the average historical income Husband had earned working exclusively at the Blount Law Firm in 2016 and 2017 ($87,433), which would total $257,527 annually, or $21,460 per month. The trial court found Husband voluntarily underemployed. It found that he voluntarily left his employment at the other firm, although it noted his testimony that he returned to work exclusively for the Blount Law Firm because of his unmanageable workload and his emotional state due to the divorce. The court stated, "Husband's first obligation is to provide support to his child and to Wife and his own needs must be balanced with the need for support and maintenance and the Court has the authority to impute income to Husband based on his earning potential."

| DIVISION OF PROPERTY | | | |
|---|---|---|---|
| Assets | Value | Husband | Wife |
| **Vehicles** | | | |
| 2014 Ford F150 | $ 15,000 | $ 15,000 | |
| 2010 FourWinns Boat | $ 12,000 | | $ 12,000 |
| 2021 Infinity QX50 Lease | $ - | $ - | $ - |
| 2001 McGregor 26X Sailboat | $ 9,000 | $ 9,000 | |
| **Retirement Accounts** | | | |
| E-Trade IRA (H) #2202 | $ 3,907 | $ 3,907 | |
| John Hancock | $ 82,439 | | $ 82,439 |
| **Personal Property** | | | |
| Household furnishings, jewelry, silver and china and camping equipment | $ 15,000 | $ 7,500 | $ 7,500 |
| **Dissipation of Assets** | | | |
| Husband | $ 5,000 | $ 5,000 | |
| Wife | $ 1,305 | | $ 1,305 |
| **Cash and Bank Accounts** | | | |
| Bank Accounts for Husband and Wife | | | |
| Bank Tennessee Checking #2500 | $ 210 | | |
| Regions Life Green Checking #9427 | $ 434 | | |
| Bank Tennessee Checking #6000 | $ 45,000 | $ 35,000 | $ 10,000 |
| **Business Bank Accounts** | | | |
| Bank Tennessee Escrow #9200 Client Funds | $ - | $ - | $ - |
| Bank Tennessee Escrow #5200 Client Funds | $ - | $ - | $ - |
| **Real Property** | | | |
| 10761 Whisper Sage Drive Collierville, TN 38017 | $ 410,000 | $ 205,000 | $ 205,000 |
| Two Cemetary Plots Memphis Funeral Home | $ 12,000 | $ 12,000 | |
| **SUB TOTALS** | $ 611,294.98 | $ 292,407 | $ 318,244 |
| | 100% | 48% | 52% |
| **Debt** | | | |
| Mortgage on Collierville Property | $ 351,161 | $ 351,161 00 | |
| IRS Tax Debt | $ 195,288 | $ 195,288 | |
| Synchrony Mastercard #1622 | $ - | | |
| Discovery Card #7304 | $ 1,332 | | $ 1,332 |
| Regions Credit Card #8091 | $ 964 | | $ 964 |
| **Debt Total** | $ 548,744.60 | $ 546,449.00 | $ 2,296.00 |

Thus, considering the marital debt, Wife received a far greater share of the marital estate. The trial court noted Husband's request to sell the marital home but found that Wife's request to remain in the home until their son graduated was reasonable. It directed the

parties to place the marital residence on the market in April 2023. Any debt remaining after the sale of the property would be the responsibility of Husband.

The trial court adopted Wife's parenting plan and addressed the issues of support. It calculated Husband's child support obligation at $1,693 but declined Wife's request for retroactive support due to his payment of the family's expenses.[8] As for his ability to pay alimony, the trial court found that Husband had reasonable current expenses of $14,509, but the court found that this amount included $3,669.70 attributable to the marital home, which Husband would no longer have, so it deducted that amount. However, he would now owe child support of $1,693. Utilizing its calculation of Husband's earning capacity at $21,270.33 per month, the trial court found that Husband would have a surplus or "disposable income" of $8,738 each month. The trial court found that Wife was economically disadvantaged, and her earning capacity would "never be close" to Husband's even with the anticipated amount she hoped to make as an insurance agent. It found that she would be unable to achieve an earning capacity that would permit her standard of living after the divorce to be reasonably comparable to the standard of living enjoyed during the marriage or the post-divorce standard of living expected to be available to Husband. Thus, the court found that rehabilitation was not feasible. It also found that both parties were at fault for the divorce, and Wife contributed to Husband's earning capacity during their 21-year marriage. The court found that Wife had current household expenses of $8,767 with the current mortgage payment, and she would have anticipated expenses after the sale of the marital home of $7,767. Considering her imputed earning capacity of $2,781.50 per month, and the child support award she would receive, the trial court calculated her "current need" at $4,292.50 per month until the marital residence sold, and $3,295.50 per month based on her expenses thereafter. Considering its finding that Husband would have "disposable income" of $8,738 per month, the court ordered him to pay $3,300 per month in alimony in futuro in addition to $1,000 per month in transitional alimony until June 2023.

Finally, the trial court found that Wife had already paid her attorney $16,900 either from marital funds or payments by Husband, and she sought alimony in solido for attorney fees and expenses totaling over $60,000. The trial court found that there was no objection to the reasonableness of the fees, only who should pay them. It found that Husband had paid $60,000 in fees between his attorneys and expert, and he paid $5,000 for Wife's expert. The court found that "Wife has a need and Husband has the ability to pay" but stated that it had also considered "the fact that Wife is also at fault for the divorce and Husband is paying the IRS debt from joint tax returns." The court further noted "protracted

---

[8] The trial court found that the expenses Husband was paying included the mortgage payment, homeowner's association dues, homeowner's insurance, internet cost, phone and cable/satellite service, home repairs, alarm system, housekeeping, the majority of Wife's vehicle lease, costs associated with the vehicles driven by the children, including gas and insurance, $275 per week to Wife, groceries for Wife and the children, medical insurance premiums and copays, optometry and dentistry bills, private school tuition, school trips and extracurricular expenses, clothing, allowance for food, and haircuts.

litigation" caused by Husband. Ultimately, the trial court ordered Husband to pay Wife alimony in solido of $25,000 for her attorney fees, at the rate of $1,000 per month. Although Husband was still proceeding pro se, the court's "Conclusions of Law and Findings of Fact" directed "[c]ounsel for the parties" to prepare for the court's approval a final decree of divorce and permanent parenting plan consistent therewith.[9]

Three more months passed without the entry of a divorce decree, and Husband filed a complaint against the trial judge with the State of Tennessee Board of Judicial Conduct on June 2, 2022. He alleged that the trial judge had failed to comply with Tennessee Code Annotated section 20-9-506, as the parties had submitted proposed final orders in April 2022 and the trial court still had not entered a final decree. On June 17, 2022, almost one year after the divorce trial began on June 29, 2021, the trial court entered its final decree of divorce and permanent parenting plan, which was consistent with the trial court's previous findings and conclusions. The final decree provided that Husband's child support and alimony obligations would begin on May 1, 2022, and his obligation to pay the expenses he was paying under previous orders of the court would cease at that time. It stated that all remaining pleadings and motions were dismissed without prejudice to refiling as a new cause of action.

On July 6, 2022, Husband, having retained counsel, filed a motion to recuse the trial judge. He asserted that the trial judge's delay had caused such injustice to the parties that there was no way for him to move for post-judgment relief without harshly criticizing the trial judge. He claimed that since the trial ended one year earlier, the parties had suffered financially and accumulated unnecessary legal debt, and the final decree was "woefully outdated and not reflective of the parties' current reality." Husband also noted that he had reported the trial judge to the Board of Judicial Conduct just days before the trial judge finally entered a final decree. Thus, he contended that a reasonable person would question the trial judge's impartiality and ability to be fair to Husband under the circumstances.

One week later, Husband filed a motion to alter or amend the divorce decree, asserting that the final decree contained manifest errors and that new evidence needed to be considered. Relevant to this appeal, Husband argued that the trial court erred by prohibiting him from testifying regarding Wife's fault for the dissolution of the marriage. Next, Husband asserted that the trial court's calculation of his earning capacity resulted in an "oppressive and impossible spousal support obligation." He asked the trial court to adjust his "astronomical" obligations "to comport with the present reality of his financial situation," as he was ordered to pay $3,300 in alimony in futuro, $1,000 in transitional alimony, $1,000 in alimony in solido, $1,696 in child support, and $1,600 for private school

---

[9] Three weeks later, on March 21, 2022, Husband filed a motion to quash a subpoena duces tecum, stating that since the July 1, 2021 trial date, "there have been a number of matters that have arisen between the parties that make it necessary to conduct post-trial discovery." Wife filed a response, acknowledging that she had attempted to obtain bank records. She noted that her petition for civil contempt and Husband's petition to modify the pendente lite support order was still pending.

tuition, for a total of $8,596 per month paid to or for Wife and their son. He asserted that the trial court's own five-year income chart showed that his net income had historically been in the range of $80,000 to $100,000, so this combination of alimony and child support obligations would result in him "being in violation of the trial court's orders from their inception." He claimed it was unreasonable to require him to pay transitional alimony to Wife to maintain the marital residence when he wanted to sell it and was struggling to pay his own rent. He contended that neither party would be able to maintain the marital standard of living after the divorce. He also asked the court to reconsider its finding of voluntary underemployment. Finally, Husband contended that the balance in his law firm operating account, which was $45,000 at the time of trial, was "gone" by the time of the divorce decree a year later, as Husband was forced to use it to pay pendente lite support, marital debt, educational expenses, etc. Because the final decree awarded Wife $10,000 from the account, Husband suggested there needed to be "a more current accounting" and "reapportionment of what little funds remain." He also filed a separate motion for new trial, asking the court to reevaluate the parties' incomes in light of the entire year that had passed since the divorce trial, as this would have a substantial impact on the proper calculation of the support obligations and be more indicative of their earning capacities. He also claimed that the divorce decree awarded assets that no longer existed, as he was forced to sell a boat to pay the marital debt. Husband submitted his own affidavit in support, along with numerous other documents, including paperwork related to Wife's employment with State Farm.[10]

On August 3, 2022, the trial court entered an order denying Husband's motion to recuse, stating that a disciplinary complaint filed against a judge does not necessarily require recusal and that the filing of the complaint did not affect her ability to be fair and impartial in this case. The judge noted that she had already entered her Conclusions of Law and Findings of Fact prior to the complaint being made, and she stated that she would continue to give the same careful consideration to the post-trial matters. Husband sought an accelerated interlocutory appeal of the recusal order pursuant to Rule 10B, but this Court dismissed the appeal on the basis that it was fatally deficient, as he did not submit the necessary documents for review.

Wife then filed a combined response to the motion to alter or amend and motion for new trial. She argued that Husband had not shown any basis for post-judgment relief and that he was simply "re-making" his arguments from trial. She also claimed that his arguments regarding the parties' incomes in the year after trial were "new facts and issues previously unlitigated" that did not support relief under Rule 59. On November 15, 2022, the trial court entered an order resolving Husband's post-judgment motions. It found no

---

[10] He claimed that Wife had perjured herself at trial because she testified that she was earning a base salary of $24,000 plus commission, when the relevant documents showed that she was earning a base salary of $28,000 plus commission, with a "Guarantee" of $35,000 (and "Estimated" total compensation of $45,000 to $60,000).

basis for granting relief because there was not previously unavailable evidence that had become available, a need to correct a clear error of law, or a need to prevent injustice. On December 13, 2022, Husband timely filed a notice of appeal to this Court.

On June 16, 2023, Husband filed a Rule 60.02 motion in the trial court. He asserted that since the final decree was entered, he had obtained relevant information through subpoenas that justified vacating the judgment, as Wife purposefully misled the trial court about her earning capacity at trial. According to Husband, documents obtained via subpoena showed that Wife started working as a teacher for the Memphis-Shelby County School System on August 1, 2022, at a salary of $56,473.89, with an ability to earn $73,273.20 if she worked a twelve month schedule, and a salary of $79,273 if she worked at an "iZone" school. (For comparison of dates, we note that the divorce decree was entered on June 17, 2022, Husband filed his motion to alter or amend on July 15, 2022, and the final order was entered on November 15, 2022.) Thus, Husband claimed that Wife's earning capacity was substantially higher than the amount the trial court imputed to her at $33,378. He also claimed that he obtained various credit applications submitted by Wife claiming a much higher income. Husband again noted Wife's statement at trial that she was earning a base salary of $24,000 plus commission when in fact she was guaranteed $35,000 and expected to earn $45,000 to $60,000. Finally, he noted her testimony that she intended to continue working as an insurance agent.[11]

Husband then filed a motion for this Court to remand to the trial court for resolution of the outstanding Rule 60 motion. On October 10, 2023, this Court granted the motion and remanded to the trial court. On January 12, 2024, the trial court entered an order denying the Rule 60 motion. The court characterized Husband's motion as one alleging intrinsic fraud by Wife. The trial court noted that she specifically testified at trial that she could have made more money working at a public school, and she testified of her intention to continue selling insurance "as of right now." The court declined to find that she purposefully misled the court simply because she started working for the public school system in August 2022, "over a year after the trial concluded, even though it was before this Court's ruling." As for the alleged misstatement of her base salary at State Farm, the trial court was not convinced that Wife attempted to mislead the court, but even if she did, it found the nominal difference would not affect the ultimate outcome.

## II. ISSUES PRESENTED

Husband presents the following issues for review on appeal:

---

[11] On August 23, 2023, Husband filed a motion to consider post-judgment facts in this Court. The motion itself consisted of two sentences asking this Court to consider the documents obtained from Memphis-Shelby County Schools and the credit applications. This Court denied the motion to consider post-judgment facts on September 7, 2023, noting that it failed to comply with Tennessee Rule of Appellate Procedure 22 in that it did not contain a memorandum of law, affidavit, or indication of efforts to consult with adverse counsel.

1.     Did the trial court err in prohibiting Husband's testimony regarding Wife's fault for the divorce?

2.     Did the trial court err in the alimony awards made to Wife in the Final Decree of Divorce?  In particular, did the trial court make a just and fair consideration of all the factors within T.C.A. §36-5-121(i) after the trial court prohibited Husband's testimony relevant to the relative fault of the parties?

3.     Did the trial court err in its calculation of Wife's imputed income?

4.     Did the trial court err in finding Husband is voluntarily underemployed for purposes of imputing income to him?

5.     Did the trial court err in its calculation of Husband's gross income for support purposes by including two large fees in its calculation that Husband earned after Wife's filing for divorce, fees that are not representative of what Husband historically earned throughout the course of the marriage?

6.     Did the trial court err in refusing to allow Husband to take deductions from his gross income for legitimate business expenses designated as "costs of goods sold" on his Federal Income Tax returns?

7.     Did the trial court err in awarding both transitional alimony and alimony in futuro to Wife?

8.     Did the trial court err in awarding Wife attorney fees as alimony in solido?

9.     Did the trial court err in making a division of marital property determination relative to a bank account, when that determination was not made on a date as near as possible to the final divorce hearing date?

In her posture as appellee, Wife presents the following additional issue:

1.     Whether this Court should award to Wife her attorney fees incurred in defending this appeal, either as a frivolous appeal or pursuant to Tenn. Code Ann. § 36-5-103(c).

For the following reasons, we vacate in part and affirm the decision of the circuit court as modified.

## III.     DISCUSSION

At the outset, we note that the parties' sons have now reached the age of majority. As such, no issues are presented on appeal regarding parenting time or child support.  The issues presented pertain to marital fault, valuation of marital property, alimony, and attorney fees.

### A.     Marital Fault

- 22 -

We begin with Husband's issue regarding marital fault. The issue he presents is whether the trial court erred "in prohibiting Husband's testimony regarding Wife's fault for the divorce." Husband argues that "it was improper for the trial court to deny Husband the opportunity to present evidence and testimony relevant to Wife's fault" because it was relevant to the ground of inappropriate marital conduct and a factor to consider in the alimony analysis. Rather than citing to the record where this alleged error occurred, Husband's brief stated, "Attached hereto as Appendix A. is the trial segment wherein the court prohibited Husband's testimony on many facts relevant to a proper determination of the parties' fault."

The attached "Appendix A" spans three pages. It begins with the portion of Husband's testimony when his counsel asked how he became aware of Wife's affair, and Wife's counsel objected on the basis of relevancy, noting that Wife had already admitted to the existence of the relationship. She noted that Wife alleged inappropriate marital conduct by Husband as well. Counsel stated that "if there's a question about dissipation . . . I understand the relevancy of that," but she added, "I just don't know why we're going down this road." In response, Husband's counsel argued that Husband was "entitled to testify as to how his relationship with his wife unraveled," noting that Wife alleged inappropriate marital conduct by him as well. The trial judge stated, "I don't think it's relevant to go – because she's already admitted to it, so *unless it goes to some other basis, some other grounds that he's alleged*, I think we need to move on from it." (emphasis added). Husband's counsel simply responded, "Thank you, Your Honor." Immediately thereafter, Husband's counsel began to question him about whether he was willing to work on the marriage or had "hope" for the marriage even after he discovered the affair. Wife's counsel again objected on the basis of relevancy, noting that both parties currently wanted a divorce. The trial judge asked Husband's counsel to clarify "to what issue" was this line of questioning relevant. Counsel said, "It's relevant to fault, Your Honor." The trial judge again stated that "she's already admitted to the relationship, so I'm not sure why we need to go down the road." Husband's counsel proceeded to explain that "this line of questioning really has a bearing on [Wife's] priorities," to the extent that "she placed other priorities over her priorities for her family and her husband and her children possibly." The trial judge stated that she was "still struggling with the relevance because if she's already admitted fault, his testimony of him still wanting to work on the marriage, I'm not sure how that has a bearing on fault one way or the other." She mentioned Husband's admission that he was also in a relationship at the time of trial and said, "I'm still not sure how this has any significant bearing on fault." The judge stated that "unless the priority has something to do with the children," she did not "want us to spend time on something that is unnecessary." Husband's counsel responded, "I understand. Your Honor, I'll just move on. That's fine. I'll move on."

This Court considered a similar situation in *Barlew v. Barlew*, No. E2004-01654-COA-R3-CV, 2005 WL 954797, at *4 (Tenn. Ct. App. Apr. 26, 2005), where a husband argued on appeal that "the trial court erred in refusing to hear evidence of Wife's fault in

the divorce." In that case, the husband's attorney attempted to ask the husband questions about why he filed for divorce, and the trial judge stated that he did not "really have to hear any grounds[.]" *Id.* Counsel argued that fault was relevant because "there is an alimony claim out there," but the trial judge stated that he did not intend to punish either party with regard to fault. *Id.* at *5. Counsel for the husband ended the exchange by stating, "Okay. I'm not going to belabor it. I would just like for him, for the record, just state why he filed for divorce since he is the plaintiff in this case. We're not going to belabor it. We're not going to go into it." *Id.* On appeal, this Court found no reversible error by the trial court. *Id.* We stated that the information the husband's counsel sought to elicit was already in the record in the form of his complaint alleging adultery and the wife's answer admitting to adultery. *Id.* Moreover, counsel's statement that "we're not going to belabor it" could "have been reasonably construed by the trial court as a disinclination to press the issue further or to object to its decision regarding relative fault." *Id.* Finally, we noted that the husband "did not request to make an offer of proof regarding his allegations of fault." *Id.*

We reach the same conclusion here. Husband's counsel ended the exchange by stating, "I understand. Your Honor, I'll just move on. That's fine. I'll move on." He also failed to make an offer of proof. When excluded evidence consists of oral testimony, "it is essential that a proper offer of proof be made in order that the appellate court can determine whether or not exclusion was reversible." *State v. Goad*, 707 S.W.2d 846, 853 (Tenn. 1986). A trial court's erroneous exclusion of evidence only requires reversal if that evidence would have affected the outcome of the trial if it had been admitted, and a reviewing court cannot make such a determination "without knowing what the excluded evidence would have been." *Jernigan v. Paasche*, 637 S.W.3d 746, 758 (Tenn. Ct. App. 2021) (quoting *Hampton v. Braddy*, 270 S.W.3d 61, 65 (Tenn. Ct. App. 2007)). "Accordingly, the party challenging the exclusion of evidence must make an offer of proof to enable the reviewing court to determine whether the trial court's exclusion of proffered evidence was reversible error." *Id.* (quoting *Hampton*, 270 S.W.3d at 65). The offer of proof must contain "the substance of the evidence and the specific evidentiary basis supporting the admission of the evidence," and this may be satisfied by presenting the actual testimony, stipulating to the content of the excluded evidence, or presenting a summary of the excluded evidence. *Id.* (quoting *Hampton*, 270 S.W.3d at 65). An appellate court "'will not reverse a trial court's ruling excluding evidence if the appellant fails to make an offer of proof regarding the substance of the evidence and the supporting evidentiary basis to support its admission.'" *Mitchell v. City of Franklin*, No. M2021-00877-COA-R3-CV, 2022 WL 4841912, at *14 (Tenn. Ct. App. Oct. 4, 2022) (quoting *Rose v. Cookeville Reg'l Med. Ctr. Auth.*, No. 2010-01438-COA-R3-CV, 2011 WL 251210, at *2 (Tenn. Ct. App. Jan. 13, 2011)). A party's failure to make an offer of proof "constitutes a waiver of the right to challenge the exclusion of [the] testimony.'" *Jernigan*, 637 S.W.3d at 758 (quoting *Hampton*, 270 S.W.3d at 65). Thus, determining whether a party waived an issue by failing to make a timely offer of proof is a "threshold issue." *Mitchell*, 2022 WL 4841912, at *14.

In her brief on appeal, Wife argued, "Husband did not make an offer of proof at trial regarding what other facts he would have testified to, if permitted. Rather, his counsel apparently acquiesced to the Court's ruling on this issue[.]" In Husband's reply brief, he acknowledged that his trial counsel "did fail to make an offer of proof at trial regarding what facts he would have testified to, if permitted," but he argued that an exception to the requirement of an offer of proof should apply because the substance of his testimony was apparent. Tennessee Rule of Evidence 103 provides:

> **(a) Effect of Erroneous Ruling.** Error may not be predicated upon a ruling which admits or excludes evidence unless a substantial right of the party is affected, and
> . . .
> (2) *Offer of Proof.* In case the ruling is one excluding evidence, the substance of the evidence and the specific evidentiary basis supporting admission were made known to the court by offer <u>or were apparent from the context.</u>

Tenn. R. Evid. 103 (underlining added). However, we disagree with Husband's suggestion that the substance of the excluded evidence was "apparent from the context" here. Our point is illustrated by the argument Husband made in his principal brief on appeal. He argued that "[b]ecause of the trial court's ruling as shown in Appendix A, Husband was not permitted to testify on the particularly painful and distressing way that he discovered Wife's adultery and inappropriate marital conduct," or "how Wife's misconduct emotionally impacted the children," or "how her subsequent, numerous, repeated acts of inappropriate marital conduct affected him throughout the later part of 2018, all of 2019 and 2020, up until the trial in June of 2021, a period of years when Wife frequently left Husband alone to care for the children while she traveled and spent marital funds to have sex with her paramour." He also complained that the trial court "heard nothing about the adulterous relations, the cruel acts, and inappropriate marital behavior of Wife which coincided with her multiple, ongoing sexual encounters with [her paramour] that resulted in her frequent absence from the marital residence throughout the later part of 2018, all of 2019, all of 2020, and the first half of 2021 up until trial." He claimed he was also "prohibited from telling the trial court how he made efforts to save the marriage despite Wife's inappropriate marital conduct, and how Wife callously rebuffed those efforts." He argued that "[a]ll of that testimony" was relevant and necessary for the trial court to hear to properly determine marital fault. He also claimed the court "improperly prohibited Husband from offering any proof on Wife's absences" and trips even though it related to dissipation of the marital assets. He claimed that he "was not permitted to testify on the number of trips he recalled Wife [] taking or how any of these trips taken by Wife affected him or the children, such as the occasions when Wife would spend the night with [her paramour] in a hotel less than a half mile away from the couple's residence, or when Wife would be absent during significant, milestone events involving the children."

It certainly was not apparent from the context of counsel's questions about how

- 25 -

Husband discovered the affair and whether he had hope for the marriage thereafter that Husband would have testified as to all of these issues. *See, e.g.*, *City of LaVergne v. Gure*, No. M2020-00148-COA-R3-CV, 2022 WL 3709387, at *4 (Tenn. Ct. App. Aug. 29, 2022) ("Mr. Gure made no offer of proof. Although the context indicates the evidence relates to the speed of Mr. Gure's car at some point in time, the substance of the evidence is unclear. The parties' briefs reflect as much. . . . So we cannot determine whether the trial court's error entitles Mr. Gure to relief."); *Belton v. City of Memphis*, No. W2019-00526-COA-R3-CV, 2020 WL 5816196, at *3 (Tenn. Ct. App. Sept. 30, 2020) ("The court indicated that it was excluding evidence of 'three contract conversations.' The substance of those conversations is not apparent from the record. While we can glean some clues from the City's motion, these clues cannot substitute for an offer of proof."); *Metro. Dev. & Hous. Agency v. Nashville Downtown Platinum, LLC*, No. M2017-00450-COA-R3-CV, 2017 WL 6210855, at *4 (Tenn. Ct. App. Dec. 8, 2017) ("Although the cited portion of the transcript perhaps suggests that Platinum desired to elicit certain post-taking information concerning the 2010 year, the exact nature of what it wanted to explore is not clear here in the absence of an offer of proof. Accordingly, it is unclear whether any of the desired evidence would be competent and appropriately admissible under our rules of evidence and whether it would have affected the trial outcome."). Because Husband's counsel failed to make an offer of proof, this Court is unable to ascertain what proof would have been introduced, and therefore he has waived review of the trial court's ruling on this issue. *See Est. of Bane v. Bane*, No. E2020-00978-COA-R3-CV, 2022 WL 853925, at *8-9 (Tenn. Ct. App. Mar. 23, 2022) ("Plaintiff made no offer of proof as to the excluded testimony. Accordingly, we are unable to review the excluded evidence and thus cannot determine whether its exclusion would have affected the outcome of the trial had it been admitted.") (quotation omitted).[12]

### B.     Valuation of Marital Asset

Next, we will consider the issue presented by Husband regarding the valuation of a marital asset. *See Mabie v. Mabie*, No. W2015-01699-COA-R3-CV, 2017 WL 77105, at *6 (Tenn. Ct. App. Jan. 9, 2017) ("Pursuant to Tennessee law, the sequence of events in a divorce ruling is that a trial court should first make its determinations as to the disposition of the parties' marital property before awarding alimony because one of the factors to be considered in awarding alimony is the provisions made with regard to the marital

---

[12] In his reply brief, Husband quoted *Hill v. Hill*, No. M2006-01792-COA-R3-CV, 2008 WL 110101, at *5 (Tenn. Ct. App. Jan. 9, 2008), in which this Court listed two exceptions to the rule requiring an offer of proof. Husband summarily stated that "[b]oth of the exceptions defined by Hill are present in this case." However, he did not cite any additional legal authority or to the record on appeal in an attempt to develop any argument regarding the second exception. Therefore, we deem his skeletal argument regarding the second exception waived. *See Sneed v. Bd. of Prof'l Resp. of Sup. Ct.*, 301 S.W.3d 603, 615 (Tenn. 2010) ("It is not the role of the courts, trial or appellate, to research or construct a litigant's case or arguments for him or her, and where a party fails to develop an argument in support of his or her contention or merely constructs a skeletal argument, the issue is waived.").

property."). Initially, we emphasize the narrow issue Husband presents on appeal: "Did the trial court err in making a division of marital property determination relative to a bank account, when that determination was not made on a date as near as possible to the final divorce hearing date." According to Husband's brief, he "specifically objects to the trial court's division of a bank account." The bank account at issue was the operating account for Husband's law firm, which he was using for all of his expenses, business and personal. In his pretrial memorandum, Husband listed this account as having a balance of $88,021 as of May 31, 2021. However, during his testimony at trial on June 30, 2021, Husband testified that the current balance of the account was only $45,000. He proposed that Wife retain her retirement account and that he retain his operating account, noting that he needed those funds to pay expenses for the Blount Law Firm such as payroll. When the trial court entered its divorce decree one year later, it valued Husband's account at $45,000 but ordered him to pay Wife $10,000 from the funds in the account.

On appeal, Husband cites Tennessee Code Annotated section 36-4-121(b)(2)(A),[13] which provides, "All marital property shall be valued as of a date as near as possible to the date of entry of the order finally dividing the marital property." Tenn. Code Ann. § 36-4-121(b)(2)(A). He notes that the divorce decree was entered in this case almost one full year after trial. Given this delay, he claims "it should be no surprise that the amount of funds in the account on July 1, 2021 was not the same as the amount that existed on June 17, 2022." Husband asks this Court to "reverse the Trial Court's ruling regarding the bank account at issue and a limited remand should be granted so that the trial court can receive evidence concerning the value of the bank account as of a date as near as possible to the date of the trial court's future ruling." Alternatively, he asks this Court to eliminate the payment to Wife from the account.

Aside from the statute itself, the only authority Husband cites in support of this issue is *Hill v. Hill*, 682 S.W.3d 184 (Tenn. Ct. App. 2023). In that case, a divorce decree assigned a value to a wife's retirement accounts "at the time of separation." *Id.* at 202. On appeal, the husband argued that the trial court erred by valuing the accounts at "the date of separation rather than the date of divorce." *Id.* at 195. We agreed with the husband that pursuant to Tennessee Code Annotated section 36-4-121(b)(2)(A), "'marital property shall be valued as of a date as near as possible to the date of entry of the order finally dividing the marital property.'" *Id.* at 202. We stated that the trial was conducted in January and June 2018, but the final order was not entered until April 22, 2020, so the account should have been valued "as of a date as near as possible to" April 22, 2020. *Id.* However, we explained,

> The obvious difficulty with adhering to the statute's requirement in this matter is that the final order was not entered until approximately twenty-two months following the trial. In addition, the proof that was introduced

---

[13] When the divorce complaint was filed, this language was found in subsection (b)(1)(A).

> concerning the value of Wife's employment-related retirement accounts was
> from July 2017, a date preceding the final order's entry by almost three years.

*Id.* Under those circumstances, we determined that the husband's issue regarding the proper valuation of the accounts had merit. *Id.* We vacated the trial court's valuation and explained that "a limited remand is necessary so that the trial court can receive evidence concerning the value of the parties' retirement accounts as of a date as near as possible to April 22, 2020," and value the accounts accordingly. *Id.* Thus, in *Hill*, the problem with the valuation was not solely due to delay by the trial court but also because the trial court valued the account "at the time of separation." *Id.* That did not occur here.

This Court recently considered another appeal involving the timing of a trial court's marital property valuation in *Barnes v. Barnes*, No. M2022-00328-COA-R3-CV, 2023 WL 6846504 (Tenn. Ct. App. Oct. 17, 2023) *perm. app. denied* (Tenn. Mar. 6, 2024). In that case, a five-day divorce trial was split between three days in October 2020 and two days in June 2021. *Id.* at *9. The husband introduced his asset and liability statement on the first day of trial in October 2020. *Id.* On the fourth day of trial in June 2021, he requested "to update the marital property values, because it had been nearly eight months since the values were introduced." *Id.* The trial court refused this request. *Id.* As a result, by the time the final decree was entered in November 2021, "the values were just over a year old." *Id.* The husband then filed a motion to alter or amend, again requesting that the court update the values. *Id.* The trial court again refused, stating that updating the values would require reopening the proof, which the court deemed inappropriate. *Id.*

On appeal, Mr. Barnes argued that the trial court erred by "not updating the value of the marital estate in response to his requests." *Id.* at *8. He claimed that the trial court's actions violated Tennessee Code Annotated section 36-4-121(b)(2)(A). *Id.* at *9. To begin, we explained that decisions regarding the value of marital property are questions of fact, and the parties bear the burden of presenting competent evidence of value. *Id.* at *8. However, we also recognized that section 36-4-121(b)(2)(A) cabins the discretion of the trial court with regard to the timing of valuation. *Id.* at *9. In the *Barnes* case, the trial court had twice declined the husband's requests to update his proof of valuation, once during the trial and once in response to his motion to alter or amend. *Id.* at *10. However, in declining to permit "further testimony upon ground already traversed by the parties," the trial court had noted that the parties indicated that the trial would take three days, and the court had calendared the case accordingly. *Id.* Thus, the trial court explained that "it was the parties, not the court, that were at fault for the delay that arose in completing the trial, which instead took five days." *Id.* The court also referenced the scheduling challenges it faced in dealing with a backlog of cases after Covid-19. *Id.* "Furthermore, the trial court observed the impossibility of and confusion caused by continually updating valuation during the course of trial proceedings." *Id.* The trial court "viewed allowing further proof as creating unnecessary complexities." *Id.* It explained that "allowing updating would not be as simple as permitting Mr. Barnes to present evidence of changed valuation but would

instead necessitate an opportunity for Ms. Barnes to be able to cross-examine and also to be able to call witnesses." *Id.* Mr. Barnes acknowledged the trial court's stated concerns on appeal but argued that "the trial court's rationale provides an improper basis to deny permission to update valuation." *Id.* He claimed that he was "merely endeavoring to update the valuation" of assets with a readily ascertainable value like checking accounts and retirement accounts, so the trial court's concern regarding "the time that would be necessary to update the values was misplaced." *Id.* From our review of the record, however, we concluded that the husband did not clearly communicate to the trial court that he sought a limited in scope, "less time-consuming, less complex, and less challenging update," as opposed to a broad-based update of the numerous complex assets involved. *Id.*

Nevertheless, we conceded that Mr. Barnes "raises a valid concern, contending there are limits on how far a trial court's control of its docket can go in limiting the ability of a party to present evidence related to valuation of marital property." *Id.* Given the directive of Tennessee Code Annotated section 36-4-121(b)(2)(A), we agreed that "there are limits on a trial court's ability to use docket control to justify limitations on valuation testimony in accordance with the demands of the statute." *Id.* However, the docket management concerns of the trial court remain applicable when considering what valuation date is reasonably "possible" under the statute. *Id.* Applying these principles to the facts before us, we noted that *Barnes* was not a case where the trial court failed to afford the parties the time they believed necessary to try their case and significant delay resulted. *Id.* "To the contrary," we explained, the trial court honored the attorneys' three-day trial projection, and "the delay between valuation evidence being presented and the final divorce hearing was the parties,' not the court's, fault." *Id.* We also noted the delay in scheduling the final days of trial was partly attributable to the backlog from Covid-19. *Id.* Finally, we recognized that the case involved a significant number of assets, some quite complex with respect to valuation, and the attempt to "update" the values was not as limited in scope as the husband suggested on appeal. *Id.* We observed, "In a case with dozens of assets, this helps to explain the trial court's concern that updating would create confusion and why allowing updating of valuation testimony could impinge further and unreasonably upon the trial court's docket." *Id.* Overall, "given the confluence of these circumstances," we could not say that the trial court's ruling, declining to allow testimony updating the values, was not in accordance with what was reasonably "possible" under the circumstances. *Id.*

Like the *Barnes* case, in the present case, the trial court's valuation of Husband's bank account was based on information that was roughly a year old by the time the divorce decree was entered. Unlike the *Barnes* case, however, the delay here was not attributable to the conduct of the parties. The record contains no indication as to why the trial court took one year after trial to enter its divorce decree. This Court has repeatedly recognized that "[t]he issue of delay in entering final judgment . . . is a recurring problem." *Justice v. Sovran Bank*, 918 S.W.2d 428, 429 (Tenn. Ct. App. 1995). In such cases, we have recognized:

- 29 -

An inordinate delay in resolving issues in dispute results in prejudice to the judicial process. *See* T.R.A.P. Rule 36(b). The record before us does not establish any basis for the long delay in the final resolution of the case, but all public officials are afforded the presumption that they have discharged their public responsibilities in a proper manner. Delays can be and are caused by misplaced court records, cases being inadvertently removed from the docket and other extenuating circumstances.

The attorneys for the parties are required to take all reasonable steps to obtain a timely resolution of the issues in their cases. T.R.A.P. Rule 36 provides in pertinent part:

> Nothing in this rule shall be construed as requiring relief be granted to a party responsible for an error or who *failed to take whatever action was reasonably available to prevent or nullify the harmful effect of an error.* (Emphasis supplied).

Attorneys are understandably reluctant to ask a busy trial judge to decide the issues in their case. However, after a reasonable elapse of time, attorneys should file a joint motion with the trial court asking for a judicial determination of their case. Zealous representation requires attorneys to take all reasonable steps to bring about a timely resolution of the clients' disputes. See Rule 8, Code of Professional Responsibility, canon 7. In this case, neither counsel sought relief and must bear some responsibility for the long delay.

*Hill*, 682 S.W.3d at 209 (quoting *Justice*, 918 S.W.2d at 429-30); *see also Byrd v. Byrd*, No. W2021-00926-COA-R3-CV, 2022 WL 16548578, at *20 (Tenn. Ct. App. Oct. 31, 2022).

Examining the actions taken by Husband and his counsel in this case, however, we discern another significant difference from the *Barnes* case. *Barnes* involved a party's request to update the proof of valuation beginning on the fourth day of trial. 2023 WL 6846504, at *9. Here, Husband did not seek to update his valuation proof at any point prior to the divorce decree. During the year-long delay between the divorce trial and entry of the decree, Husband filed his proposed findings of fact and conclusions of law, a petition to modify the order on temporary support, a motion to set a status conference to know when to expect a ruling, and a motion to render a decision. However, he did not seek to reopen the proof or update the valuation of his operating account or any other asset. *See, e.g.*, *Acosta v. Acosta*, 499 S.W.3d 785, 789 (Tenn. Ct. App. 2016) (finding no abuse of discretion in a trial court's decision to reopen the proof after trial to consider additional evidence relevant to alimony). Even when the trial court issued its Conclusions of Law and Findings of Fact in March 2022, valuing the account at $45,000 and awarding Wife $10,000 from the account, Husband did not raise the issue *prior to* entry of the final decree in June 2022. After the trial court entered its divorce decree, he filed a motion to alter or

amend, claiming, for the first time, that the funds in the account were "gone."[14]  The trial court denied the motion to alter or amend, and Husband did not challenge that ruling on appeal.[15]

Ultimately, "[t]he burden is on the parties to provide competent evidence of value[.]"  *Greene v. Greene*, No. M2022-01171-COA-R3-CV, 2023 WL 6619209, at *3 (Tenn. Ct. App. Oct. 11, 2023) (citing *Owens v. Owens*, 241 S.W.3d 478, 486 (Tenn. Ct. App. 2007)).  As the record stood at the time of the divorce decree, the most current evidence before the trial court as to the balance of Husband's account was his own trial testimony, and the trial court utilized that figure.  Considering all the circumstances, we decline Husband's request for relief on appeal in relation to the account balance.  *See Wilson v. Wilson*, No. M2002-02286-COA-R3-CV, 2003 WL 22238953, at *3 (Tenn. Ct. App. Sept. 30, 2003) (concluding that a husband's arguments about a valuation date being as near as possible to the final order was "not without merit but his actions preclude[d] its assertion" where he failed to produce any financial information beyond that date, so he was "precluded from asserting a premature valuation when such valuation [was] a product of his own doing").

---

[14] In *Julie C. W. v. Frank Mitchell W.*, No. M2019-01243-COA-R3-CV, 2021 WL 745288, at *1 (Tenn. Ct. App. Feb. 26, 2021) *perm. app. granted, remanded on other grounds* (Tenn. Aug. 11, 2021), a divorce trial occurred over the course of eleven days spread out over several months from January through July 2018.  Months passed before the entry of the final decree, and it was entered in March 2019.  *Id.* at *12.  On appeal, the wife argued that the trial court erred in finding that it could not hear any updated evidence regarding the value of assets after entry of the final decree because the parties stipulated to values at the inception of trial.  *Id.* at *20.  She claimed that by the time of the final decree, the stipulated values were "stale."  *Id.*  However, the husband suggested that she had "waited" for the trial court to issue its divorce decree to determine if the ruling was to her liking.  *Id.*  We stated that "a party may not stipulate to certain facts, await a result, incur an adverse result, and then seek to modify the stipulation."  *Id.* at *20.

[15] We note that Husband included one sentence in the introductory summary of his argument section stating that "[t]he trial court should have either granted Husband's timely filed Motion to Alter and Amend or his Motion for New Trial."  He also characterized his appeal as an "appeal of the trial court's order denying his two post trial motions."  However, neither motion was ever mentioned again in the argument section of his brief.  The issues framed by Husband on appeal did not reference the motions, nor did he develop any argument on appeal regarding the denial of these motions.  *See Turner v. WW Steeplechase, LLC*, No. E2020-00579-COA-R3-CV, 2021 WL 3127106, at *5 (Tenn. Ct. App. July 23, 2021) ("Significantly, Plaintiffs have not appealed the denial of their . . . Motion to Alter or Amend."); *Ingram v. Ingram*, No. W2017-00640-COA-R3-CV, 2018 WL 2749633, at *11 n.3 (Tenn. Ct. App. June 7, 2018) ("Husband did not designate the adjudication of his motion to alter or amend as a separate issue in his brief."); *Burris v. Burris*, 512 S.W.3d 239, 255 n.11 (Tenn. Ct. App. 2016) ("Mother's choice to confine her appeal only to the question of whether the trial court denied her motion to alter or amend is somewhat puzzling. . . . Because Mother filed a timely Rule 59.04 motion and filed her notice of appeal within thirty days of the trial court's denial of that motion, she was entitled to appeal both the underlying judgment and the denial of her post-trial motion. Mother chose, however, to limit the issue on appeal only to the denial of her motion to alter or amend."); *Kantz v. Bell*, No. M2013-00582-COA-R3-CV, 2014 WL 4058823, at *3 n.5 (Tenn. Ct. App. Aug. 15, 2014) ("The Rule 59.04 Motion to Alter or Amend was denied by the trial court; the Trust does not appeal that ruling.").

### C.   *Alimony*

The remaining seven issues presented by Husband all relate to alimony. We will address each one in turn. However, we recognize that the trial court was considering issues of child support and alimony simultaneously when making its decisions below. As previously noted, the issue of child support is no longer relevant because the children have reached the age of majority, and the parties present no issues on appeal regarding child support. The matter is somewhat complicated, however, because the section of the divorce decree addressing alimony only spans about three pages of the thirty-page decree but summarily "reincorporates [the trial court's] previous findings contained herein" in other sections of the decree.

In reviewing a trial court's award of alimony, appellate courts must bear in mind that "trial courts in Tennessee have broad discretion to determine whether spousal support is needed and, if so, to determine the nature, amount, and duration of the award." *Mayfield v. Mayfield*, 395 S.W.3d 108, 114 (Tenn. 2012). Because decisions regarding spousal support are factually driven and require the balancing of many factors, "the role of an appellate court is not to second guess the trial court or to substitute its judgment for that of the trial court, but to determine whether the trial court abused its discretion in awarding, or refusing to award, spousal support." *Id.* (citing *Gonsewski v. Gonsewski*, 350 S.W.3d 99, 105 (Tenn. 2011)). "'An abuse of discretion occurs when the trial court causes an injustice by applying an incorrect legal standard, reaches an illogical result, resolves the case on a clearly erroneous assessment of the evidence, or relies on reasoning that causes an injustice.'" *Id.* (quoting *Gonsewski*, 350 S.W.3d at 105).

### 1.  Voluntary Underemployment of Husband

The first issue raised by Husband concerning alimony is whether the trial court erred in finding him "voluntarily underemployed for purposes of imputing income to him." The trial court's discussion of the parties' earning capacities and the issue of voluntary underemployment is found in the section of its order addressing the division of the marital estate, and the trial court then carried over its income calculations to the sections on child support and alimony. The court cited no applicable legal standards or factors, in either section, regarding a determination of voluntary underemployment. It simply concluded:

> Husband voluntarily terminated and thus voluntarily underemployed. [sic] Husband's first obligation is to provide support to his child and to Wife and his own needs must be balanced with the need for support and maintenance and the Court has the authority to impute income to Husband based on his earning potential.

A specific section of the Tennessee Child Support Guidelines "governs the situation in which a parent is deemed voluntarily underemployed." *Al Qaisi v. Alia*, No. M2020-

- 32 -

00390-COA-R3-CV, 2021 WL 345416, at *8 (Tenn. Ct. App. Jan. 28, 2021). It provides that when a parent has been found to be willfully or voluntarily underemployed, "'additional income can be allocated to that parent to increase the parent's gross income *to an amount which reflects the parent's income potential or earning capacity*, and *the increased amount* shall be used for child support calculation purposes.'" *Id.* (quoting Tenn. Comp. R. & Regs. 1240-02-04-.04 (3)(a)(2)(ii)(II)) (emphasis in *Al Qaisi*). However, Tennessee's alimony statute simply includes as one factor to consider, when determining the nature, amount, length of term, and manner of payment: "The relative *earning capacity*, obligations, needs, and financial resources of each party, including income from pension, profit sharing or retirement plans and all other sources." Tenn. Code Ann. § 36-5-121(i)(1) (emphasis added). Consequently, "'[w]hat is necessary to be found before a court can impute income to [a spouse] when determining [the] need for alimony purposes is not necessarily the same as what must be found before a court can impute income . . . for purposes of calculating child support under the Guidelines." *Rogin v. Rogin*, No. W2012-01983-COA-R3-CV, 2013 WL 3486955, at *21 (Tenn. Ct. App. July 10, 2013) (quoting *Pearson v. Pearson*, No. E2007-02154-COA-R3-CV, 2008 WL 4735305, at *15 (Tenn. Ct. App. Oct. 27, 2008)).[16]

"This Court has previously considered a party's 'capacity to earn' rather than his actual income for purposes of alimony, even when there was no finding that the party was willfully and voluntarily underemployed." *Id.* (citing *Yattoni-Prestwood v. Prestwood*, 397 S.W.3d 583, 594 (Tenn. Ct. App. 2012); *Storey v. Storey*, 835 S.W.2d 593 (Tenn. Ct. App. 1992)). Still, Tennessee courts do often consider whether a spouse is voluntarily underemployed in the context of determining his or her earning capacity for purposes of alimony. *See, e.g.*, *Chase v. Chase*, 670 S.W.3d 280, 293-94 (Tenn. Ct. App. 2022) (concluding that a spouse's career choice did not render her voluntarily underemployed for purposes of alimony); *Robinson v. Robinson*, No. E2020-01535-COA-R3-CV, 2022 WL 2336504, at *10 (Tenn. Ct. App. June 29, 2022) ("Willful and voluntary underemployment can impact the amount of child support and alimony to be paid."); *Small v. Small*, No. M2009-00248-COA-R3-CV, 2010 WL 334637, at *4 (Tenn. Ct. App. Jan. 28, 2010)

---

[16] In *Pearson*, 2008 WL 4735305, at *13-15, for instance, we found no error in a trial court's finding that a wife was *not* willfully unemployed for purposes of child support but imputed income to her for purposes of alimony based on her earning capacity. Likewise, in *Waddell v. Waddell*, No. W2020-00220-COA-R3-CV, 2023 WL 2485667, at *45 (Tenn. Ct. App. Mar. 14, 2023) *perm. app. denied* (Tenn. Sept. 12, 2023), we rejected a wife's argument that the trial court erred or "contradicted itself" by imputing no income to her for child support purposes but finding that she had an earning capacity of $182,000 for alimony purposes.

We note, however, that courts sometimes adopt the same analysis both for child support and alimony. *See, e.g.*, *Hopwood v. Hopwood*, No. M2015-01010-COA-R3-CV, 2016 WL 3537467, at *12 (Tenn. Ct. App. June 23, 2016) ("We have previously affirmed the trial court's finding that Father is willfully and voluntarily underemployed as well as its calculation of Father's income based upon an average of his deposits in the marital account in the years prior to the divorce for child support purposes. For the same reasons, we also affirm the trial court's calculation of Father's income at between $100,000.00 and $110,000.00 for alimony purposes.").

("Willful and voluntary underemployment can impact the amount of alimony to be paid since the statute governing alimony specifically refers to earning capacity, as opposed to actual earnings.") (internal quotations omitted). In the specific context of alimony, we have explained:

> When called upon to determine whether a person is willfully and voluntarily unemployed or underemployed, the courts must consider the person's past and present employment, as well as the reasons for the unemployment or the taking of a lower paying job. If the decision for unemployment or for taking a lower paying job is reasonable, the court will not find the person to be willfully and voluntarily underemployed.

*Chase*, 670 S.W.3d at 293 (quoting *Byrd v. Byrd*, 184 S.W.3d 686, 691 (Tenn. Ct. App. 2005)). This reasoning applies equally to the obligor spouse and the obligee spouse. *Id.* "'Whether a party is willfully and voluntarily underemployed [or unemployed] is a fact question, and the trial court has considerable discretion in its determination.'" *Robinson*, 2022 WL 2336504, at *10 (quoting *Willis v. Willis*, 62 S.W.3d 735, 738 (Tenn. Ct. App. 2001)). Thus, a trial court's finding of underemployment is afforded a presumption of correctness unless the preponderance of the evidence is otherwise. *Id.*

Husband contends that the trial court erred in finding him voluntarily underemployed and that his decision to return to work exclusively for the Blount Law Firm was reasonable. Considering his past and present employment and his reasons for taking a lower paying job, we agree. *See Chase*, 670 S.W.3d at 293. Husband began working for the Blount Law Firm, founded by his grandfather, when he was in college, at least five years before the parties married. He joined the firm when he became licensed to practice law in 1998. When he married Wife at age 27, he was working for the Blount Law Firm with his father, and he continued working there throughout the parties' marriage. Husband testified that his employment situation only changed in late 2018 when he was "desperately trying to stay married." He testified that Wife informed him that the primary reason she wanted a divorce was because of their financial issues. Wife acknowledged during her testimony that she had "begged [Husband] for years" to give up the Collierville office building and get a job at another firm. Thus, Husband explained that when he was offered the job at this other firm, Wife had just informed him that she wanted a divorce, he "didn't have any relief in sight in terms of a purchaser" for the Collierville office, and it all "came to a head" at the same time, so he decided to try working at the other firm in an effort to save his marriage. However, Wife filed for divorce anyway, and he finally sold the Collierville office shortly thereafter. Husband tendered his resignation to the other firm after two years, ending his employment there about three months before trial. He explained that his work environment at the other firm was "absolutely miserable" because it was a very high volume personal injury practice that he was "not accustomed to" after practicing for twenty years, his entire career, at the Blount Law Firm. As an associate attorney at the other firm, he was expected to handle between 200 and 300 cases at a time. Husband said

- 34 -

he simply could not keep up with that demand.  He said his emotional state had deteriorated during the divorce proceeding, so it was difficult for him to focus on his workload and he feared that he was going to commit legal malpractice.  In fact, Husband noted that shortly before trial, he had paid the other firm $20,000 toward its deductible on its malpractice insurance because of concerns that he had let the statute of limitations run on one of its cases.  Husband said his fear of something like that happening was a big reason why he had left the firm.  He said he simply could not "responsibly" handle that workload, and he "wanted to be a good lawyer for a more responsible number of people."  Additionally, Husband noted that his income had already "fallen off" at the other firm because he had not been meeting its earnings goals, and therefore, his percentages had been reduced, so he would not have been earning as much at the other firm going forward as he had earned in 2020.  We also note that Husband had continued working on cases for the Blount Law Firm during his brief period of employment with the other firm and decided to resume working there full-time.

In *Berkshire v. Berkshire*, No. E2014-00022-COA-R3-CV, 2014 WL 6735385, at *7 (Tenn. Ct. App. Dec. 1, 2014), this Court concluded that the evidence supported a trial court's finding that a husband was *not* voluntarily underemployed where he "provided at least three objectively reasonable reasons why he quit his job."  The three reasons were as follows: "(1) they cut his hours and earnings significantly, breaching his employment agreement; (2) he had to commute 140 miles round-trip from Roane County to Cookeville and back each workday; and (3) the Cookeville job required him to work on unfamiliar Hyundai cars—vehicles on which he did not enjoy working."  *Id.*  We likewise conclude that Husband provided objectively reasonable reasons for returning to work full-time for the Blount Law Firm.  "If the decision for unemployment or for taking a lower paying job is reasonable, the court will not find the person to be willfully and voluntarily underemployed."  *Chase*, 670 S.W.3d at 293.  We conclude that the evidence preponderates against the trial court's finding that Husband was voluntarily underemployed.  To the extent that this finding impacted the trial court's alimony determination, this finding is vacated.[17]

---

[17] It is not entirely clear how the trial court's finding of voluntary underemployment actually impacted its determination of Husband's earning capacity and ultimate award of alimony.  The section of the divorce decree regarding Husband's earning capacity spanned 43 paragraphs and included a five-year calculation of Husband's average income.  Then, in the final paragraph, the trial court included the two sentences quoted above regarding voluntary underemployment and, apparently for purposes of comparison, stated that its five-year average income calculation was "approximate" to the average amount Husband earned at the Blount Law Firm historically ($87,433) combined with the average amount Husband earned during his two years at the other firm ($170,094), totaling $257,527.33.  However, the trial court utilized the five-year average throughout the remainder of the divorce decree, rather than these figures.

In any event, however, we note that simply *combining* Husband's average income from the years he worked exclusively at the Blount Law Firm with his average annual income from the other firm would not accurately assess Husband's earning capacity, even if we had found that he should have continued his employment there.  Husband testified that working at the other firm diminished the income he received from the Blount Law Firm because he was not actively pursuing cases for the Blount Law Firm and "gave"

## 2. Wife's Earning Capacity

Next, we consider Husband's contention that the trial court erred in its calculation of Wife's imputed income or earning capacity upon finding her voluntarily underemployed. Husband agrees with the trial court's finding of voluntary underemployment but argues that the trial court erred in imputing income to her of only $33,378 per year, the amount she earned during the marriage while working at the private Christian school where the children attended. He notes that Wife was only 49 years old and in good health, she had a master's degree in education and many years of teaching experience, and she only worked at the private school during the marriage in order to receive the tuition discount and health insurance it provided for the family. Husband notes Wife's testimony that she was told she could earn between $45,000 and $60,000 in *her first year* selling insurance for State Farm. Considering these facts, he argues that the trial court should have imputed income of $60,000 to Wife.

"The determination of a party's potential income is a question of fact that requires careful consideration of all the attendant circumstances." *Levy v. Levy*, No. W2023-01124-COA-R3-CV, 2024 WL 3747842, at *5 (Tenn. Ct. App. Aug. 12, 2024) (citing *Pearson v. Pearson*, No. W2018-01188-COA-R3-CV, 2019 WL 2394247, at *6 (Tenn. Ct. App. June 6, 2019)). Earning capacity means "'[a] person's ability or power to earn money, given the person's talent, skills, training, and experience.'" *Id.* at *5 (citing *Black's Law Dictionary* (11th ed. 2019)) (emphasis omitted). As such, determining a party's earning capacity "requires consideration of the party's circumstances and qualifications, including their age, past and present employment, education and training, and ability to work." *Id.*

Wife testified that she had "ma[d]e a sacrifice" by working at the private school throughout the marriage because she could have been "making more money at a public school." When questioned about her decision to leave the education field, she testified that she did not take any steps to reactivate her teaching license "because, honestly, I think I can make beyond the 30,000." She added, "[I]n this new career my potential and aspiration is to make more than that." She became employed with State Farm in October 2020. At the time of her deposition in April 2021, Wife was asked, "what do you believe your earning capacity to be at State Farm," and she testified that it was "anywhere between 45 to 60,000 in the first year." At the time of trial two months later, she had switched to a different agent but remained with State Farm. When asked if she still expected to make between $45,000 and $60,000 in her first year, Wife responded, "I honestly don't know how much I'm going to make. I'm just going to put in all the time and effort I can."

---

most cases to the other firm under their fee arrangement. Thus, it is not reasonable to believe that Husband could, in a single year, earn the *combined* amount of his annual income from the other firm in addition to what he earned while working exclusively for the Blount Law Firm.

In the trial court's findings relevant to Wife's voluntary underemployment, it specifically found that she "could have taken steps to renew her teaching certificate to teach in public schools after leaving [the private school] *where she testified, she could make more money*." (emphasis added). At the same time, however, the court ultimately found it appropriate to impute income only at the level Wife made at the private Christian school, deeming it "a good indicator of her earning potential and not the speculative amount of what she could possibly earn at some point in the future." We agree with Husband that Wife has the ability to earn more money than she made at the private school during the marriage. As she states in her own brief on appeal, "Wife freely admitted that teaching at [the Christian school] was a 'sacrifice' she made for the sake of the parties' children," and "she could have earned a higher salary in a public school." The trial court also noted Wife's testimony that she was told she could earn between $45,000 and $60,000 "in her first year selling insurance," but it found that she had switched agents two months earlier and now "does not know how much she is going to make." Still, it found that she had "secured employment that has the potential to earn at or more than what she made as a teacher." We agree with Husband that the evidence preponderates against the trial court's factual finding of Wife's earning capacity at only $33,378. Considering Wife's age, past and present employment, education and training, and ability to work, *see Levy*, 2024 WL 3747842, at *5, we conclude that the evidence supports a finding that Wife has an earning capacity of at least $45,000 per year, or $3,750 per month. Wife's affidavit of income and expenses listed her current mandatory deductions from her income at $319.56 per month based on an annual income of $28,069. Therefore, we will estimate deductions of $500 and a monthly net income of $3,250. *Cf. Egan v. Egan*, No. M2018-01858-COA-R3-CV, 2020 WL 2761261, at *4 (Tenn. Ct. App. May 28, 2020) (deducing "an approximate amount of need" and stating that courts have not been required to find a specific dollar amount of need in every instance).

### 3. Class Action Fees

The next issue Husband presents on appeal is whether the trial court erred in calculating his income "by including two large fees in its calculation that Husband earned after Wife's filing for divorce, fees that are not representative of what Husband historically earned throughout the course of the marriage." He argues that "the trial court improperly disregarded the opinion of Husband's expert and adopted the opinion of Wife's expert" on this issue, effectively giving the class action fees too much "weight" in its calculation of his earning capacity.

Tennessee courts routinely consider a party's previous earnings when determining earning capacity. *Levy*, 2024 WL 3747842, at *5. "Taking pre-divorce earnings into account is proper and consistent with the court's responsibility under Tenn. Code Ann. § 36-5-121(i) in determining an initial award of alimony." *Bordes v. Bordes*, 358 S.W.3d 623, 630 (Tenn. Ct. App. 2011). Because the trial court's determination of Husband's earning capacity in this case was also made for the purposes of its child support

determination, and some of these principles were mentioned during the expert testimony, we also note certain rules applicable to child support determinations. *See Jensen v. Jensen*, No. E2023-00315-COA-R3-CV, 2024 WL 4032972, at \*23 & n.6 (Tenn. Ct. App. Sept. 4, 2024) (noting in its alimony analysis the child support guideline regarding averaging of variable income, even though the husband did not raise an issue regarding child support on appeal, "given that the [trial] court's income determination for Husband was also integral to the setting of his child support obligation").

Pursuant to the Child Support Guidelines, "[v]ariable income such as commissions, bonuses, overtime pay, dividends, etc. shall be averaged over a reasonable period of time consistent with the circumstances of the case and added to a parent's fixed salary or wages to determine gross income." Tenn. Comp. R. & Regs. 1240-02-04-.04(3)(b). Although this guideline specifically addresses variable "components of income," the same reasoning applies to a parent whose total income is variable. *Smith*, 2001 WL 459108, at \*5. However, "the Guidelines do not specify how to average the incomes." *Hayes v. Hayes*, No. M2014-00237-COA-R3-CV, 2015 WL 1450998, at \*4 (Tenn. Ct. App. Mar. 26, 2015). Thus, "in determining income for the purposes of child support and alimony, 'it is left to the courts to determine on a case-by-case basis the most appropriate way to average fluctuating income.'" *Jensen*, 2024 WL 4032972, at \*23; *see, e.g.*, *Tinsley v. Tinsley*, No. M2001-02319-COA-R3-CV, 2002 WL 31443210, at \*5 (Tenn. Ct. App. Nov. 1, 2002) (concluding that "the trial court's choice of the most recent three full years of income information as the basis for averaging falls within the range of acceptable alternatives" but recognizing "the possibility that a parent could demonstrate specific circumstances making a particular year or set of years undependable for purposes of determining current actual income").

In *Siegel v. Siegel*, No. 02A01-9708-CH-00198, 1999 WL 135090, at \*5 (Tenn. Ct. App. Mar. 5, 1999), this Court considered how to determine a husband's earning capacity, for purposes of alimony and child support, when he had recently left a law firm and started practicing as a solo practitioner. The trial court based its income calculation on the last five months of 1996, when the husband worked at the solo practice, concluding that his income at the law firm was low because he spent so much time representing himself in the divorce case and was not representative of his future earning capacity. *Id.* at \*5-6. On appeal, the husband argued that "the increase in his compensation during the last five months of 1996 was due to two significant contingent fee settlements," and therefore, "the trial court erred in calculating alimony and child support based only on his increased income from the last five months of 1996 rather than his average income over the entire year of 1996." *Id.* at \*5. On appeal, this Court reversed the trial court, concluding that it erred in basing its calculation on those five months. *Id.* at \*6. We acknowledged that the husband "underperformed" while at the law firm but pointed out that "the greater earnings in the latter half of 1996 were at least partially due to two large settlements." *Id.* We added, "There is no indication whether Husband will continue to receive large settlements on a regular basis." *Id.* We declined to use a two-year average because that approach

would place "unfair emphasis" on his lower earnings at the firm. *Id.* As such, we determined that a one-year average would "best reflect his income and earning capacity for the purpose of determining child support and alimony." *Id.*

"'Tennessee courts have displayed a preference for long-term averaging as the most appropriate method for calculating income that is variable in nature.'" *Marcel v. Marcel*, No. M2021-00594-COA-R3-CV, 2022 WL 17335655, at *6 (Tenn. Ct. App. Nov. 30, 2022) (quoting *Burnett v. Burnett*, No. W2007-00038-COA-R3-CV, 2008 WL 727579, at *11 (Tenn. Ct. App. Mar. 19, 2008)); *see also Hanselman v. Hanselman*, No. M1998-00919-COA-R3-CV, 2001 WL 252792, at *3 (Tenn. Ct. App. Mar. 15, 2001) (noting that "short duration averaging will undermine the stability, predictability, and definiteness of child support" and "prompt more litigation"). "In general, courts have tended to average variable income over as long a time period as circumstances permit." *Turney v. Turney*, No. W2001-00492-COA-R3-CV, 2002 WL 1349503, at *3 (Tenn. Ct. App. Feb. 15, 2002); *see, e.g.*, *Jensen*, 2024 WL 4032972, at *23-24 (affirming the use of a three-year average of income from 2017 to 2019 when the husband "did not present a complete picture of his income for 2020 or 2021"); *Buntin v. Buntin*, 673 S.W.3d 593, 607 (Tenn. Ct. App. 2023) (affirming the use of a four-year average); *Waddell v. Waddell*, No. W2020-00220-COA-R3-CV, 2023 WL 2485667, at *46 (Tenn. Ct. App. Mar. 14, 2023) (finding the evidence did not preponderate against an earning capacity of $1 million when the husband earned average wages between 2013-2017 of $1,281,652 but his wages in 2016 and 2017 were only $734,506 and $758,408); *Egan*, 2020 WL 2761261, at *4 (affirming the trial court's determination of an earning capacity "just under the five-year monthly average" according to the parties' tax returns); *Andrews v. Andrews*, 344 S.W.3d 321, 343 (Tenn. Ct. App. 2010) (concluding that the evidence supported a finding that the husband could maintain an income of $850,000 per year when his average gross income in the four years prior to trial was $895,161 but he testified that he would soon be losing some of his "moonlighting" income).

Here, the trial court determined that a five year average was appropriate. It rejected Mr. Pascal's opinion that a two or three year average was appropriate, noting that Husband's income had varied from 2015 to 2019 and that Mr. Pascal had "no factual basis for his opinion that Husband will make the same in 2021 or 2022." Neither party argues on appeal that the trial court erred by adopting a five-year average, and we conclude that a five-year average was appropriate in this case given Husband's variable income and his two extraordinary years. The precise issue Husband raises is whether the trial court erred in its consideration of the two large class action fees by assigning those fees only to the years when they were received, within that five year averaging period.

Wife's expert, Mr. Pascal, proposed including all of the fees in the years they were received, explaining his position that "for support purposes, when you receive the money is when it is earned." As support for his opinion that income should be "based on the year in which cash payments are received," his report cited the definition of a "contingent fee"

from "Law.com." Mr. Pascal was aware that the two class action cases had been filed years earlier but noted that he did not see any records reflecting when the work was done. He admitted that he had no knowledge of how "work intensive" a class action lawsuit is. Even assuming that Husband "worked" on a lawsuit for years, however, Mr. Pascal said that it is his practice to record income when it is received, and he noted that the IRS also views income as earned when it is received.

Husband's expert, Ms. MacAulay, used a different approach. She divided the fee of $421,863 received in the Methodist case by the thirteen years the case was pending so that $30,868 of the fee was allocated to each year between 2007 and 2020. She used the same procedure for the Cemetery case, allocating the fee of $288,404 over the number of years the case was pending, back to 2014, assigning $52,360 to each of those years. For the years when both suits were pending, she added $83,228 to Husband's other income for those years. She believed that it was appropriate to average the fees in this manner because this was not income regularly received, he had no other class action lawsuits and or similar cases pending, and these two cases lasted for periods of thirteen and six years. She opined that including all of the income in the years received was inappropriate because that approach did not represent what Husband has made historically. At trial, Wife's counsel criticized Ms. MacAulay's approach as "remarkably flawed math." She argued that it was "absurd" to suggest allocating a class action fee over the life of the case and insisted that "there are no cases to support such a position."

At the outset, we recognize that "[t]here are no hard and fast rules for spousal support decisions." *Perkins v. Perkins*, No. W2021-01246-COA-R3-CV, 2023 WL 2446807, at *4 (Tenn. Ct. App. Mar. 10, 2023) (citing *Anderton v. Anderton*, 988 S.W.2d 675, 682 (Tenn. Ct. App. 1998)). However, Ms. MacAulay's approach is not without some support. In *Bordes v. Bordes*, 358 S.W.3d 623, 625-26 (Tenn. Ct. App. 2011), this Court considered the earning capacity of a husband who owned a pest control franchise at the time of his divorce in 1999 but sold the franchise in 2009 and purchased a restaurant. The franchise sold for $409,137.70. *Id.* at 630. He filed a petition to modify his alimony obligation, claiming a decrease in income. *Id.* at 625. We found that the proceeds from the sale of the franchise "produced income to Husband during a portion of the ten year period at issue; this could properly be considered as evidence of Husband's ability to pay in accord with Tenn. Code Ann. § 36-5-121(i)(1) and it is appropriate to consider this amount in the determination of earning capacity." *Id.* at 630. However, we decided to divide the amount of $409,137.70 by the ten years that lapsed between the divorce and the sale of the franchise, resulting in a figure of roughly $25,000 per year. *Id.* at 630-31. We then considered the allocated sum in addition to all other evidence bearing on his earning capacity and found his earning capacity to be $75,000 per year. *Id.* at 631.

In some cases, we have deemed it appropriate to *exclude* one-time sources of income when determining a spouse's earning capacity for purposes of alimony. *See, e.g.*, *Knizley v. Knizley*, No. M2018-00490-COA-R3-CV, 2019 WL 6358208, at *5 (Tenn. Ct. App.

Nov. 27, 2019) (concluding that the record supported the trial court's finding that the husband "averaged a net monthly income of $33,168.00 over the last six (6) years, *exclusive of* a one-time payment of $1.16 million he had received in 2015 as a result of a 7-year project that has now concluded") (emphasis added); *Lunn v. Lunn*, No. E2014-00865-COA-R3-CV, 2015 WL 4187344, at *12 (Tenn. Ct. App. June 29, 2015) (finding a 2011 tax return was the best evidence of a husband's income because it reflected growth in his dental practice "but did not include the supplemental income he received in 2010 while working for the separate practice in Memphis" as such income "would likely not recur in the future"). In *Small*, 2010 WL 334637, at *6, the husband was a lawyer and earned sums of "$326,375.00 for 2002; $347,818.00 for 2003; $212,163.00 for 2004; $309,749.00 for 2005; $427,730.00 for 2006; and $1,124,704.00 for 2007." According to the husband, "the unusually large amount of income earned in 2007 was because 'the SEC kept extending the deadline for little company compliance' with the Sarbanes-Oxley Act 'until December of 2007 . . . [s]o they had to get out of the system by the end of the year . . . That's why this year was such a big rush.'" *Id.* On appeal, we determined his earning capacity for purposes of spousal and child support to be $250,000, explaining that "we have taken the difference between Husband's $150,000.00 salary and his average salary for the years 2002-2006 (*excluding* 2004 and 2007) of $352,000.00." *Id.* (emphasis added). Likewise, in *Halliday v. Halliday*, No. M2011-01892-COA-R3-CV, 2012 WL 7170479, at *6 n.9 (Tenn. Ct. App. Dec. 6, 2012), we considered the same "model" employed in *Small* to determine a husband's earning capacity by "averaging his income at the time of trial with his historical income average, which was calculated by using six years of tax returns and disregarding the most and least profitable years." *Id.* Thus, we disregarded the most and least profitable years "as outliers." *Id.* *See also In re Conservatorship of King*, No. M2014-01207-COA-R3-CV, 2015 WL 4746810, at *9 (Tenn. Ct. App. Aug. 6, 2015) (citing *Small* and *Halliday* for the notion that "courts may exclude 'outliers' in determining averages for matters like expenses or income").[18]

This Court has also considered how to treat "one-time income amounts" such as inheritances or capital gains for the purposes of calculating child support. *Collins v. Harrison*, No. M2023-00248-COA-R3-JV, 2024 WL 1750072, at *6 (Tenn. Ct. App. Apr. 24, 2024). Although these sums *must* be considered as income under the Child Support Guidelines, "[i]nherited amounts may be averaged over a period of years rather than counted as income for only one year." *Id.* Similarly, "proration of [capital] gains over time is permitted." *Id.* Thus, "the Guidelines afford the court discretion to average variable income or prorate one-time income amounts such as an inheritance or capital gain." *Id.* For instance, in *Wadhwani v. White*, No. M2015-01447-COA-R3-CV, 2016 WL 4579192, at *17 (Tenn. Ct. App. Aug. 31, 2016), a father received $107,000 in inheritance from a

---

[18] When discussing the fees during closing arguments at trial, Husband's counsel stated, "Your Honor could realistically say, you know what, we ought not to include any of that in his prospective income going forward because there's no evidence that there's anything like that that's going to happen again." But he added, "That's not the position we're taking in this case."

relative's estate, and the trial court concluded that the amount should be included in his gross income, but it determined the amount "should be averaged over a period of ten years rather than counted as income for one year." *Id.* On appeal, we found the trial court's approach of dividing the total sum over a ten-year period was "fair and equitable." *Id.* We explained, "To have counted this entire sum as income for one year would have produced a falsely elevated child support award, which Father would likely be unable to maintain once the inherited funds were depleted." *Id. See also Alexander v. Alexander*, 34 S.W.3d 456, 463-64 (Tenn. Ct. App. 2000) (prorating capital gains over the number of years the stock was held by assigning a "per-year allocation" to each year).

Considering the various approaches taken in these cases, we agree with Ms. MacAulay's position that averaging or proration is appropriate in this case given the isolated nature of the two class action settlements. As we observed in *Wadhwani*, to count the entire sums as income in the years received would produce a "falsely elevated" award that Husband would likely be unable to maintain going forward. 2016 WL 4579192, at *17. Indeed, Mr. Pascal calculated the Blount Law Firm's adjusted total income at $95,644 for 2018; $142,041 for 2019, and for 2020, he calculated it at $464,296. Husband had never earned such income historically. Adding these figures to Husband's W-2 income from the other firm from 2019 and 2020, Mr. Pascal calculated Husband's 2019 total income at $268,108, and his 2020 income at $678,417. This is simply not a realistic picture of Husband's earning capacity for purposes of paying alimony. To illustrate the difference, we note that Ms. MacAulay calculated Husband's total gross income, including his W-2 income from the other firm, as follows: $165,920 in 2015; $182,064 in 2016; $179,699 in 2017; $179,550 in 2018; $154,617 in 2019; and $309,817 in 2020. Again, earning capacity means "[a] person's ability or power to earn money, given the person's talent, skills, training, and experience." *Levy*, 2024 WL 3747842, at *5 (quotation omitted). It requires consideration of Husband's circumstances and qualifications, including age, past and present employment, education and training, and ability to work. *Id*. Considering all the circumstances in this case, we deem the proration approach utilized by Ms. MacAulay as the more accurate approach for determining Husband's earning capacity and agree that the class action fees should be allocated over the period of years when Husband worked on those cases.

To the extent that Mr. Pascal suggested that this method would amount to averaging upon averaging, we do not deem it impermissible under the circumstances of this case, involving variable income in addition to the receipt of income that may be prorated over a number of years. *See, e.g.*, *Smith v. Smith*, No. 01A-01-9705-CH-00216, 1997 WL 672646, at *3 (Tenn. Ct. App. Oct. 29, 1997) ("Since Mr. Smith apparently accumulated his stock options during the entire period of his employment at Comdata, and not just during the year in which he exercised them, *it might be equitable to average his capital gains over that entire period, or to prorate them in some way, rather than just averaging them over the three year period that was used for calculating his average salary, commission and bonus*. The trial court may take proof on the process by which the options were acquired, in order

to make this determination.") (emphasis added).

### 4. Cost of Goods Sold Deduction

The next issue raised by Husband on appeal pertains to the deduction for "cost of goods sold" on his 2019 tax return. Wife's expert, Mr. Pascal, testified that when he was evaluating Husband's income, he questioned a deduction Husband took on his income tax return in 2019 for $85,763 for "cost of goods sold" because a law firm does not "per se" have a cost of goods sold or sell inventory. He said Husband was asked about this deduction during his deposition and deferred to his CPA. Finding no support for that amount, Mr. Pascal proposed adding the sum of $85,763 back to Husband's income for 2019. He noted that Husband's tax returns had only included a cost of goods sold deduction in one other year, back in 2015. On cross-examination, Mr. Pascal acknowledged that Husband had taken large deductions for "operating expenses" in past years, but in 2019, he had taken a smaller deduction for "operating expenses" and a separate deduction for "cost of goods sold." For instance, Husband's deduction for operating expenses in 2018 was $127,804, and in 2019, the total of his operating expenses deduction ($29,341) and his cost of goods sold deduction ($85,763) was roughly $115,000. Mr. Pascal was also aware of Husband's position that he deferred to his accountant to prepare the tax returns but "assumed" that both deductions represented his operating expenses considering that he does not sell goods. However, Mr. Pascal did not accept this explanation. He noted that when Wife's counsel tried to get information from Husband's tax preparer "regarding the make up of the numbers in the tax return," the tax preparer claimed that "he didn't have anything," which Mr. Pascal found "highly unusual."

When determining Husband's net income for 2020 (as his tax return for 2020 had not yet been filed), Mr. Pascal again used in his calculation only the reduced "operating expenses" amount from 2019 of $29,341. Mr. Pascal was asked if it would have been more accurate to calculate 2020 using either the 2018 operating expense figure of $127,804 or the combined deductions from 2019 of roughly $115,000. He said that he did not utilize those figures because "there was no evidence from the CPA as to how he came up with $85,763" for the cost of goods sold deduction, and also, Husband went to work for the other firm at the end of 2018 and presumably would not have had as many overhead or operating expenses.

Ms. MacAulay again used a different approach than Mr. Pascal. In determining the net income of the Blount Law Firm in 2019, she deducted the operating expenses *and* the cost of goods sold. Likewise, for 2020, she used the same operating expenses *and* cost of goods sold from 2019. Thus, Ms. MacAulay acknowledged that one difference in her report and Mr. Pascal's report was that Mr. Pascal did not include the deduction of $85,763 when calculating net income. Ms. MacAulay conceded that when she started reviewing Husband's returns, his deduction for cost of goods sold "popped out at me." She stated that she called Husband's CPA for an explanation. However, the trial court sustained a

- 43 -

hearsay objection as to what Ms. MacAulay was told by the CPA. The trial court also sustained an objection and excluded a report that was provided to Ms. MacAulay by the CPA because the information was subpoenaed and requested in discovery but not provided by the CPA. After these rulings, Ms. MacAulay went on to testify that typically the "cost of goods sold" represents a situation when a business buys goods and sells them that year and reports the cost of the goods sold. She acknowledged that she was not aware of Husband purchasing or selling any goods. However, Ms. MacAulay testified that she had another client who was a personal injury lawyer whose tax returns recorded "cost of goods sold" for his case expenses, so she had "seen that treatment before."

Ms. MacAulay also testified that Husband's "total expenses" on his Schedule C in past years was fairly consistent: $118,901 in 2016; $111,372 in 2017; $127,804 in 2018; and in 2019, $29,341 plus "Cost of Goods Sold" of $85,763. Because the previous deductions were "all consistent" with the combined deductions for 2019, Ms. MacAulay explained that she "felt comfortable" utilizing both figures and carrying them over into her calculation for 2020. She also noted that the Blount Law Firm almost doubled its revenue in 2020, so "one would assume" that when your revenue has increased you would also have at least as much in expenses. In sum, Ms. MacAulay explained that she did not think it "look[ed] right" for Husband's expenses to drop from roughly $132,000 to $29,000. During cross-examination, Ms. MacAulay was asked if she considered the fact that Husband sold the Collierville office building and started working for the other firm at the end of 2018, to the extent that this would impact the amount of his business expenses in 2019. She said that "[j]ust because he didn't have a building doesn't mean he didn't have the expenses." She noted that Husband was still working on cases for the Blount Law Firm, and the sale of the building "doesn't mean he didn't have other expenses."

In the final decree of divorce, the trial court found that Mr. Pascal questioned the deduction for cost of goods sold "because attorneys don't sell inventory," Husband never provided support for it when requested, he had only taken this deduction in one other year, and he was employed by the other firm in 2019 and 2020, having sold his building and no longer incurring the "major overhead or expenses" of maintaining a physical building for the Blount Law Firm. The trial court was "not persuaded" that the deduction for cost of goods sold was simply additional operating expenses because a separate deduction was taken for that category of expenses. Finally, the court noted that "Husband's credibility is in question as he never supplied the information to Wife's Counsel supporting this contention though requested and there is no other evidence in the record to support the cost of goods sold." As such, the trial court declined to consider the deduction for cost of goods sold, added it back to Husband's income, and did not consider it for purposes of determining his income in 2020.

We cannot say that the evidence preponderates against the trial court's findings on this issue. Although Ms. MacAulay pointed out that the combination of Husband's two deductions was consistent with his operating expenses historically, we recognize that by

2019 and 2020, Husband had sold the Collierville building and was primarily working for the other firm. Husband testified about the "very high" expenses associated with maintaining the Collierville building. Ultimately, like the trial court, we note that Husband could have produced the underlying documentation to support the deduction he claimed on his tax return, and he simply failed to do so. Given the trial court's concern about Husband's credibility with respect to this issue, we discern no error in its decision to exclude any deduction for the cost of goods sold in its calculations of his net income.

Utilizing Ms. MacAulay's calculation of Husband's annual gross income, because she allocated the class action fees over the appropriate years, we adjust her figures as follows: $182,064 in 2016; $179,699 in 2017; $179,550 in 2018; for 2019, $154,617 + $85,763 = $240,380; and for 2020, $309,817 + $85,763 = $395,580. With these adjustments, the five-year average annual income for Husband would therefore equal $235,454.60, or $19,621.21 per month. Husband's statement of income and expenses estimated his tax liability at 25%, so we will calculate his net income in the same manner. Subtracting his estimated tax liability, Husband would have monthly net income of $14,715.90. We recognize that these numbers are still high considering Husband's historical income earned throughout the marriage from the Blount Law Firm. However, we note that these are the calculations proposed by Husband's own expert, as adjusted on appeal in consideration of the issues presented to this Court.

### 5. The Trial Court's Awards of Alimony in Futuro and Transitional Alimony

Having considered Husband's various issues regarding the calculation of the parties' earning capacities, we now turn to his contention that the trial court failed to "make a just and fair consideration" of the statutory factors in making its awards of alimony. As previously discussed, the trial court awarded $3,300 in alimony in futuro, $1,000 per month in transitional alimony until the marital home sold, and $1,000 per month in alimony in solido for twenty-five months.

The Tennessee Supreme Court has explained the various types of alimony and the principles that guide our analysis as follows:

> Tennessee recognizes four distinct types of spousal support: (1) alimony in futuro, (2) alimony in solido, (3) rehabilitative alimony, and (4) transitional alimony. Tenn. Code Ann. § 36-5-121(d)(1) (2010 & Supp. 2012). Alimony in futuro, a form of long-term support, is appropriate when the economically disadvantaged spouse cannot achieve self-sufficiency and economic rehabilitation is not feasible. *Gonsewski*, 350 S.W.3d at 107. Alimony in solido, another form of long-term support, is typically awarded to adjust the distribution of the marital estate and, as such, is generally not modifiable and does not terminate upon death or remarriage. *Id*. at 108. By contrast, rehabilitative alimony is short-term support that enables a

disadvantaged spouse to obtain education or training and become self-reliant following a divorce. *Id.*

Where economic rehabilitation is unnecessary, transitional alimony may be awarded. Transitional alimony assists the disadvantaged spouse with the "transition to the status of a single person." *Id*. at 109 (internal quotation marks omitted). Rehabilitative alimony "is designed to increase an economically disadvantaged spouse's *capacity* for self-sufficiency," whereas "transitional alimony is designed to aid a spouse who already possesses the capacity for self-sufficiency but needs financial assistance in adjusting to the economic consequences of establishing and maintaining a household without the benefit of the other spouse's income." *Id*. Consequently, transitional alimony has been described as a form of short-term "bridge-the-gap" support designed to "smooth the transition of a spouse from married to single life." *Engesser v. Engesser*, 42 So.3d 249, 251 (Fla. Dist. Ct. App. 2010).

. . . .

Tennessee statutes concerning spousal support reflect a legislative preference favoring rehabilitative or transitional alimony rather than alimony in futuro or in solido. *See* Tenn. Code Ann. § 36-5-121(d)(2)-(3); *Gonsewski*, 350 S.W.3d at 109. Not even long-term support is a guarantee that the recipient spouse will be able to maintain the same standard of living enjoyed before the divorce because "two persons living separately incur more expenses than two persons living together." *Gonsewski*, 350 S.W.3d at 108 (quoting *Kinard v. Kinard*, 986 S.W.2d 220, 234 (Tenn. Ct. App. 1998)). Although the parties' standard of living is a factor courts must consider when making alimony determinations, *see* Tenn. Code Ann. § 36-5-121(i)(9), the economic reality is that the parties' post-divorce assets and incomes often will not permit each spouse to maintain the same standard of living after the divorce that the couple enjoyed during the marriage. *Gonsewski*, 350 S.W.3d at 113. Decisions regarding the type, length, and amount of alimony turn upon the unique facts of each case and careful consideration of many factors, with two of the most important factors being the disadvantaged spouse's need and the obligor spouse's ability to pay. *Id.* at 109-10.

*Mayfield*, 395 S.W.3d at 115-16.

In the case before us, Husband argues that Wife has the ability to support herself, he has no ability to pay, and therefore, the trial court erred in awarding any alimony in futuro or transitional alimony to Wife. He does not suggest that an award of rehabilitative alimony would have been appropriate, so we will limit our review to the arguments presented on appeal. He argues that the trial court failed to consider all the statutory factors for consideration and abused its discretion in determining his ability to pay and Wife's need. He also argues that he "has effectively paid Wife all the transitional alimony he should be required to pay throughout the years of this divorce" by paying all of the family's

- 46 -

household expenses. Thus, he contends that he "should no longer be required to pay any support to Wife in any form whatsoever."

Tennessee Code Annotated section 36-5-121(i) provides, in pertinent part:

(i) In determining whether the granting of an order for payment of support and maintenance to a party is appropriate, and in determining the nature, amount, length of term, and manner of payment, the court shall consider all relevant factors, including:
(1) The relative earning capacity, obligations, needs, and financial resources of each party, including income from pension, profit sharing or retirement plans and all other sources;
(2) The relative education and training of each party, the ability and opportunity of each party to secure such education and training, and the necessity of a party to secure further education and training to improve such party's earnings capacity to a reasonable level;
(3) The duration of the marriage;
(4) The age and mental condition of each party;
(5) The physical condition of each party, including, but not limited to, physical disability or incapacity due to a chronic debilitating disease;
(6) The extent to which it would be undesirable for a party to seek employment outside the home, because such party will be custodian of a minor child of the marriage;
(7) The separate assets of each party, both real and personal, tangible and intangible;
(8) The provisions made with regard to the marital property, as defined in § 36-4-121;
(9) The standard of living of the parties established during the marriage;
(10) The extent to which each party has made such tangible and intangible contributions to the marriage as monetary and homemaker contributions, and tangible and intangible contributions by a party to the education, training or increased earning power of the other party;
(11) The relative fault of the parties, in cases where the court, in its discretion, deems it appropriate to do so; and
(12) Such other factors, including the tax consequences to each party, as are necessary to consider the equities between the parties.

Tenn. Code Ann. § 36-5-121(i). The trial court's order is not a model of clarity, as it cites section 36-5-121(i) then "reincorporates its previous findings contained herein and looks at the following additional factors set forth in T.C.A. § 36-5-121(i)[(9)-(10)]." Thus, the trial court only made specific findings regarding alimony factors nine and ten. For the other factors, it appears that the trial court was attempting to incorporate by reference its previous findings of fact and conclusions of law regarding the grounds for divorce and

distribution of the marital estate in the first eighteen pages of the divorce decree. Thus, we have reviewed those findings as well to the extent they are relevant. *See Adams v. Adams*, No. M2019-00309-COA-R3-CV, 2020 WL 2062302, at *7 (Tenn. Ct. App. Apr. 29, 2020) ("Although the trial court did not make specific findings regarding each factor set forth in Tennessee Code Annotated § 36-5-121(i), we determine that the court did make findings throughout the final decree that are relevant to each applicable statutory factor.").

In its separate discussion of factors nine and ten, the trial court found that Husband was the primary breadwinner and that Wife did stay home for a few years to raise the parties' children. The trial court found that "[d]espite any expressed or perceived financial problems during the marriage," the parties still enjoyed a middle class lifestyle. The court noted that they had a nice home, two or three boats, nice automobiles, and a housekeeper during the school year when Wife worked. The court noted that the three children attended a costly private school, and the family took vacations to Florida almost every year. It noted that Husband "enjoyed tailor made suits and hobbies such as sailing and bike riding[.]" The court found that Wife "aided" Husband in achieving his professional goals and growing his business by acting as a homemaker and co-signing the loan that enabled Husband to refinance the building used by his law practice. The court found that Wife also worked as a teacher at the children's private school, providing them with a tuition discount and insurance for the family. The court noted that Husband paid most household expenses but Wife paid the water bill and other household expenses, and after Wife left the private school, Husband paid all the tuition, expenses, and health insurance. It found that both parties were at fault for the divorce.

In previous sections of the divorce decree, the trial court also found that the parties were married over 21 years by the time of trial, and both were 49 years old and in good mental and physical health. It found that two of the children had reached the age of majority and the youngest was "a rising junior" in high school at the time of trial. The court found that Wife has a master's degree in education with a minor in psychology and a "Master of Science in Curriculum and Instruction from UT Knoxville." It found that Husband had been licensed to practice law since 1998. It made other findings regarding both parties' earning capacities, which we have already discussed in the previous sections regarding voluntary underemployment. The court found that the parties' marital estate included $611,294.98 in marital property and $548,744.60 in marital debt. It awarded Wife $318,244 in assets and assigned her only $2,296 in marital debt. It awarded Husband $292,407 in marital assets and assigned him $546,449 in marital debt. Neither party owned significant separate property.

The trial court found that Wife is economically disadvantaged and was financially dependent on Husband throughout the marriage. It found that her earning capacity would never be close to Husband's even with the anticipated amount she hoped to make as an insurance agent. It found that Wife would not be able to achieve an earning capacity that would permit her standard of living after the divorce to be reasonably comparable to the

standard of living during the marriage or the post-divorce standard of living expected to be available to Husband. Therefore, the court determined that rehabilitation was not feasible, and an award of alimony in futuro was appropriate. The evidence supports these findings, and we cannot say that the trial court abused its discretion in determining that Wife had a need for alimony in futuro. We now turn to the amount awarded -- $3,300 per month.

The trial court found that Husband had "reasonable expenses" currently totaling $14,509, as reflected on his income and expense statement.[19] However, the trial court found that "this includes his current obligation for marital home expenses in the amount of $3669.70 which he will no longer have," so the trial court deducted that amount from Husband's expenses. We find this statement erroneous based on our review of Husband's income and expense statement. After Husband's "total monthly personal expenses" of $10,839.30, he listed $3,669.70 of "Marital Expenses for Which Husband is Currently Obligated," which included the mortgage/insurance/HOA costs in addition to $535 per month to the IRS for the past due taxes. Because Husband was assigned the IRS debt, he will continue to owe that amount after the divorce decree. Therefore, we will add $535 back to the trial court's finding of Husband's reasonable personal expenses, for a total of $11,374.30. The trial court also added to Husband's expenses his post-divorce child support obligation of $1,696, and we will do the same, showing that Husband has post-divorce expenses of $13,070.30. As previously discussed, we have determined Husband's monthly net income or earning capacity to be $14,715.90. As a result, without any consideration of alimony awards, we determine that Husband has a monthly surplus of $1,645.60. The evidence simply does not support the trial court's determination that Husband has "disposable income of $8,738.03" per month. First of all, this amount was based on an imputed earning capacity of $255,244 annually or $21,270.33 per month, assigning all the class action fees to the years received. Second, it was based on a monthly expense amount that did not include his IRS tax obligation. Finally, it does not appear that the trial court considered Husband's monthly *net* income, after taxes, in calculating his "disposable income." The trial court found Husband had "gross monthly income" of $21,270.33 and simply deducted Husband's monthly expenses from that sum. However, Husband listed his "estimated taxes" of $4,191 per month in the section of his income and expense statement regarding gross and net income, and it does not appear that the trial court took estimated taxes into consideration.

---

[19] Both parties included expenses for the children within their monthly expenses. However, neither party challenged the reasonableness of the other's expenses, and the trial court expressly found that the total amount listed by each party was reasonable. As a result, we have utilized the total expenses listed by the parties as well, without scrutinizing or adjusting those figures. *Cf. Cain-Swope v. Swope*, No. M2018-02212-COA-R3-CV, 2020 WL 865396, at *12 (Tenn. Ct. App. Feb. 21, 2020) (rejecting a wife's argument on appeal that some of the husband's "expenses should be lowered because they were directed at the couple's adult children" where "both Wife and Husband claimed expenses that related to their adult children").

For Wife, the trial court found that she had "reasonable anticipated expenses" of $7,767 and an additional need of $1,000 until the marital home sold, as reflected on her income and expense statement.[20] (She listed an anticipated mortgage payment of $2,500 after the divorce but an additional $1,000 in need until the marital home sold.) Utilizing the amount she made at the private Christian school as her earning capacity, and considering her child support award, the trial court calculated Wife's "need" after the marital residence sold at $3,295.50 and her current need at $1,000 more.[21] However, we have determined her earning capacity to be $45,000 annually and her monthly net income to be $3,250. Substituting this net income figure, considering Wife's child support award, and utilizing the same amount of monthly expenses, we determine Wife's monthly deficit to be $2,821 when the marital home sells and $1,000 more until then.

In summary, we determine that Husband has a monthly surplus of $1,645.60, and Wife has a monthly deficit of $2,821 when the marital home sells and $1,000 more until then. The trial court ordered Husband to pay $3,300 per month in alimony in futuro beginning in May 2022, $1,000 per month in transitional alimony from May 2022 until June 2023, and $1,000 per month in alimony in solido for 25 months. Thus, Husband's total alimony obligation is $5,300 per month for the first year, $4,300 per month for the second year, and $3,300 thereafter. Husband argues on appeal that this combination of alimony "imposes a debilitating economic burden on [him] that, if left in place, will cripple his ability to provide funds necessary to pay his reasonable business and living expenses, marital debt, and currently outstanding debt for legal expenses related to this divorce." Considering that Husband has a monthly surplus of only $1,645.60, based on a calculated earning capacity that remains somewhat inflated based on his receipt of the class action fees, we agree that Husband simply does not have the ability to pay alimony at these levels, primarily in the first year after the divorce.

Again, there is no absolute formula for determining the amount of an alimony award. *Jackman v. Jackman*, 373 S.W.3d 535, 547 (Tenn. Ct. App. 2011). The "real need" of the spouse seeking support is the most important factor. *Id.* However, "[t]his Court has recognized that spousal support 'must be administered within the capability of the supporting spouse to provide the needed support.'" *Hernandez v. Hernandez*, No. E2012-02056-COA-R3-CV, 2013 WL 5436752, at *7 (Tenn. Ct. App. Sept. 27, 2013) (quoting *Loria v. Loria*, 952 S.W.2d 836, 838 (Tenn. Ct. App. 1997)). Simply put, "a court order cannot create money where none exists." *Id.* (quoting *Eaves v. Eaves*, No. E2006-02185-COA-R3-CV, 2007 WL 4224715, at *6 (Tenn. Ct. App. Nov. 30, 2007)). "The trial court and this court must deal with the parties' financial situations as they are, not as we would hope them to be." *Dempsey v. Dempsey*, No. M1998-00972-COA-R3-CV, 2000 WL

---

[20] Neither party challenges this finding on appeal.

[21] *See Levy*, 2024 WL 3747842, at *8 (concluding that "the trial court did not err in reducing Wife's need by the amount that she will be receiving from Husband in monthly child support"); *Lindsley v. Lindsley*, No. M2019-00767-COA-R3-CV, 2020 WL 7029361, at *10 (Tenn. Ct. App. Nov. 30, 2020) (explaining that child support "should be considered incident to a determination of need for alimony").

1006945, at *9 (Tenn. Ct. App. July 21, 2000).

"This Court has previously held that a trial court abuses its discretion in awarding alimony in an amount that a spouse 'cannot realistically afford to make.'" *Hopwood*, 2016 WL 3537467, at *15 (quoting *Woods v. Woods*, No. M2002-01736-COA-R3-CV, 2005 WL 1651787, at *9 (Tenn. Ct. App. July 12, 2005)); *see also Griffin v. Griffin*, No. M2019-01113-COA-R3-CV, 2020 WL 4873251, at *13 (Tenn. Ct. App. Aug. 19, 2020) ("We have previously held that a trial court abuses its discretion when order[ing] a spouse to pay alimony in an amount that would create a substantial deficit for the obligor spouse, especially where there has been no indication that the obligor spouse's income and expenses were manipulated or exaggerated.") (quotation omitted); *Cain-Swope v. Swope*, 523 S.W.3d 79, 100 (Tenn. Ct. App. 2016) ("Although the trial court has broad discretion in determining the amount of alimony to award to a disadvantaged spouse, it is an abuse of discretion for a trial court to order a spouse to pay alimony in an amount that would create a substantial deficit for the obligor spouse."). Accordingly, "this court has reduced the amount of spousal support when, taking into consideration the paying spouse's other financial obligations, it has determined that the paying spouse would have insufficient income to support himself or herself." *Woods*, 2005 WL 1651787 at *11. *See, e.g.*, *Russell v. Russell*, No. M2012-02156-COA-R3-CV, 2013 WL 6228164, at *7 (Tenn. Ct. App. Nov. 27, 2013) (modifying an alimony award on the basis that it was "beyond Husband's ability to pay" when the amount of alimony left him "without the resources to pay rudimentary expenses"); *Walker v. Walker*, No. E2001-01759-COA-R3-CV, 2002 WL 1063948, at *5 (Tenn. Ct. App. May 29, 2002) (reducing an alimony award because the husband did not have the ability to pay the amount ordered).

Given that Husband's monthly surplus at the time of trial was only $1,645.60, and the trial court awarded alimony in solido of $1,000 per month for 25 months, this leaves Husband with a monthly surplus of only $645.60 in the year after the divorce, prior to consideration of any alimony in futuro or transitional alimony. Wife's need (aside from the additional expense associated with the marital home, which we will discuss separately) was $2,821. As such, we reduce the alimony in futuro award from $3,300 to $1,800 per month for the first year after the divorce decree, from May 1, 2022, until May 1, 2023. This award leaves both parties with a monthly deficit of roughly $1,000 during this time period, but Husband simply could not pay Wife more than this sum while still meeting his own basic expenses. We do recognize that the real need of the spouse seeking support is the most important factor, *Jackman*, 373 S.W.3d at 547, but we also note that Wife was awarded a greater share of the marital assets, while Husband was assigned the vast majority of the marital debt. The record also reflects that the parties lived above their means, saved very little, and the marital estate was relatively small, with the parties resorting to the nonpayment of income taxes to fund their lifestyle. Under such circumstances, "it cannot be expected that the parties would be able to maintain the same standard of living as during the marriage." *Rogin*, 2013 WL 3486955, at *22. "While enabling the spouse with less income 'to maintain the pre-divorce lifestyle is a laudable goal,' the reality is that '[t]wo

- 51 -

persons living separately incur more expenses than two persons living together.'" *Gonsewski*, 350 S.W.3d at 108 (quoting *Kinard*, 986 S.W.2d at 234). "[D]ivorcing couples are often forced into a lower standard of living because they cannot afford the same standard of living with double the households and double the expenses." *Waddell*, 2023 WL 2485667, *48. Simply put, "two households cannot be maintained as cheaply as one." *Dempsey*, 2000 WL 1006945, at *8.

We also observe, however, that Husband's child support obligation of $1,696 was only to last for approximately a year after the divorce decree, as Husband began paying child support on May 1, 2022, and the youngest son was expected to graduate in May 2023, just a few months after the filing of the notice of appeal in this case. *See, e.g.*, *Gonsewski*, 350 S.W.3d at 111 n.10 (examining the parties' expenses but noting that "[t]he $506 child support obligation ended two months after the trial"); *Dempsey*, 2000 WL 1006945, at *8 (noting that a parent's child support obligation for an older child was to end shortly after the case was appealed). Removing the child support payment of $1,696 from Husband's expenses greatly increases his monthly surplus, from $645.60 to $2,341.60, and he would no longer owe the private school tuition payment of $1,603.30, increasing his surplus to $3,944.90. Thus, beginning June 1, 2023, it appears that Husband has the ability to pay the trial court's original award of $3,300 per month in alimony in futuro. The termination of the child support obligation increases Wife's need as well.

"Automatic increases in alimony are not unheard of but are 'generally not appropriate.'" *Sparks v. Sparks*, No. E2022-00586-COA-R3-CV, 2023 WL 4067179, at *8 (Tenn. Ct. App. June 20, 2023) (quoting *Longstreth v. Longstreth*, No. M2014-02474-COA-R3-CV, 2016 WL 1621094, at *6 (Tenn. Ct. App. Apr. 20, 2016)). In *Erwin v. Erwin*, No. W1998-00801-COA-R3-CV, 2000 WL 987339, at *1 (Tenn. Ct. App. June 26, 2000), the parties had one minor child at the time of the divorce, who was seventeen years old and scheduled to graduate from high school in May 1999. The divorce trial was held in the summer of 1998. *Id.* The trial court ordered the husband to pay $500 per month in alimony in futuro until his child support obligation ended, less than a year after entry of the order, at which point the alimony payment would increase to $1,000. *Id.* at *2. This Court affirmed, noting that the husband's ability to pay alimony was "directly affected by the termination of his child support obligation" and would increase as a result. *Id.* Likewise, in *Bloom v. Bloom*, No. W1998-00365-COA-R3-CV, 2000 WL 34410140, at *1-2 (Tenn. Ct. App. Sept. 14, 2000), the parties had a fifteen year old son, and the trial court ordered an increase in alimony "[t]he first month after Defendant's obligation to pay child support ceases[.]" Relying on *Erwin*, we affirmed the automatic increase when the husband was no longer obligated to pay child support, noting that his ability to pay alimony increased upon the termination of his child support obligation. *Id.* at *5. However, "this Court has explained that the circumstances of *Erwin* and *Bloom* are unique because in both cases the child support obligation was soon to terminate." *Sparks*, 2023 WL 4067179, at *9. In *Anderson v. Anderson*, No. M2005-02029-COA-R3-CV, 2007 WL 957186, at *8-9 (Tenn. Ct. App. Mar. 29, 2007), this Court distinguished *Erwin* and *Bloom* based on the

ages of the children involved. We explained that "the legislature has granted the courts broad powers to shape alimony awards 'according to the nature of the case and the circumstances of the parties,'" and we concluded that "those powers are expansive enough to include such automatic increases where the circumstances warrant." *Id.* at *8 (quoting Tenn. Code Ann. § 36-5-121(a)). However, the children in *Anderson* were only eight years old. *Id.* We noted that in *Erwin* and *Bloom*, "the inclusion in those cases of an automatic increase in the alimony awards allowed the trial court to shape the award in such a way as to closely track a change in the obligor's ability to pay resulting from a relatively imminent event," which "spared the parties the additional expense and trouble that they would have otherwise incurred from having to re-open the question of alimony so soon after the court's decree." *Id.* With such a long period of time at issue in *Anderson*, we concluded that the statutory provisions for modification of alimony "furnish[ed] the most appropriate vehicle for dealing with those events, and would relieve the trial court from having to base its judgment on an act of clairvoyance." *Id.* at *9.

In *Jenkins v. Jenkins*, No. E2014-02234-COA-R3-CV, 2015 WL 5656451, at *1 (Tenn. Ct. App. Sept. 25, 2015), this Court affirmed an automatic increase in alimony in futuro upon termination of a child support obligation where the parties' youngest child was seventeen years old at the time of trial. The trial court reasoned that upon cessation of the child support obligation, the husband would have a greater monthly surplus *and* the wife's need would also increase. *Id.* at *5. Specifically, the wife's need would increase by approximately $1,000 per month, as she "would no longer receive $1,208 in monthly child support but would experience a reduction in her monthly expenses by $253 for expenses related to the child."[22] *Id.* Thus, the trial court awarded the wife alimony in futuro in the amount of $3,500 per month until the husband's child support obligation terminated and $4,500 per month thereafter. *Id.* On appeal, we affirmed the award "in terms of nature, duration, and amount," concluding that the trial court properly determined the wife's need and the husband's ability to pay. *Id.* at *6. Although the husband argued that the wife included expenses for their adult children, we noted that "when determining the proper adjustment to Wife's alimony award upon cessation of Husband's child support obligation, the trial court deducted all expenses related to the youngest daughter," so it had "properly considered and deducted any amounts attributable to the parties' adult children." *Id.* at *6-7.

Thus, we have summarized the cases on this issue as follows:

[W]e have approved automatic increases in alimony in limited circumstances, such as when a minor child will soon reach majority and the

---

[22] Using the same approach, we note that Wife will no longer be receiving $1,696 per month in child support. However, Wife listed expenses solely attributable to the youngest son totaling $367, and she stated that her $800 monthly grocery expense was for "Wife and Children." Thus, we estimate that her need increases by around $1,000 per month with the termination of the child support obligation.

obligor is no longer required to pay child support. *See Bloom v. Bloom*, No. W1998-00365-COA-R3-CV, 2000 WL 34410140, at *5 (Tenn. Ct. App. Sept. 14, 2000); *Erwin v. Erwin*, No. W1998-00801-COA-R3-CV, 2000 WL 987339, at *2 (Tenn. Ct. App. June 25, 2000). In these unique cases, we reasoned that automatic modification was appropriate because a spouse's ability to pay alimony was directly affected by the termination of child support. *See Erwin*, 2000 WL 987339, at *2. Since the ability to pay alimony is one of the most important factors in determining the amount of alimony, an automatic increase may be appropriate when child support is no longer required. *See id.* Importantly, the facts in [*Erwin*] and *Bloom* were unique because the minor children were approaching the age of majority; therefore, the modification of alimony was certain to occur shortly after the order was issued. *See id.* at *1 (daughter was 17 at the time of the divorce); *Bloom*, 2000 WL 34410140, at *1 (son was 15 at the time of trial). By including the automatic modification provision, the trial courts in these cases "spared the parties the additional expense and trouble that they would have otherwise incurred from having to re-open the question of alimony *so soon after the court's decree*." *Anderson v. Anderson*, No. M2005-02029-COA-R3-CV, 2007 WL 957186, at *8 (Tenn. Ct. App. Mar. 29, 2007) (emphasis added).

Except in cases involving unique circumstances that are expected to occur in the near future, automatic modifications are generally not appropriate. *See id.*

*Longstreth*, 2016 WL 1621094, at *6.

Here, the youngest son was about to begin his junior year of high school at the time of trial in June 2021, but the divorce decree was entered a year later in June 2022, ordering Husband to begin paying child support and alimony as of May 1, 2022. Their son turned eighteen in September 2022 and was expected to graduate in May 2023. Thus, by the time the trial court denied Husband's post-trial motions to alter or amend and for new trial in November 2022, their son had already turned eighteen and was expected to graduate in May. Therefore, we conclude that the same unique circumstances present in *Erwin* and *Bloom* warrant an automatic increase in this case. The termination of child support greatly impacts Husband's ability to pay alimony and Wife's need. Therefore, the alimony in futuro award is reduced to $1,800 for the first year of Husband's obligation, May 2022 to May 2023, but automatically increased to $3,300 as of June 1, 2023.

For the additional award of $1,000 per month in transitional alimony, Husband first argues that an award of alimony in futuro and transitional alimony appears "inapposite." "Transitional alimony assists the disadvantaged spouse with the transition to the status of a single person," and is "a form of short-term bridge-the-gap support designed to smooth the transition of a spouse from married to single life." *Mayfield*, 395 S.W.3d at 115 (quotations omitted). It "is designed to aid a spouse who already has the capacity for self-

- 54 -

sufficiency but needs financial assistance in adjusting to the economic consequences of establishing and maintaining a household without the benefit of the other spouse's income." *Id.* at 117.

This Court has affirmed awards of both transitional alimony and alimony in futuro. *See, e.g., Pallekonda v. Pallekonda*, No. W2023-00574-COA-R3-CV, 2024 WL 983162, at *2, *7-8 (Tenn. Ct. App. Mar. 7, 2024) (discerning no abuse of discretion in the manner in which the trial court crafted spousal support to include transitional alimony of $9,000 a month for 72 months and then $7,000 a month as alimony in futuro, as "it was an entirely acceptable decision on the part of the trial court to conclude that Wife not only needed support in adjusting to the economic consequences in the immediate wake of the divorce but also that a subsequent award of in futuro support was proper"); *Henry v. Henry*, No. M2019-01029-COA-R3-CV, 2020 WL 919248, at *5-8 (Tenn. Ct. App. Feb. 26, 2020) (affirming an award of transitional alimony for thirty months followed by a lesser amount of alimony in futuro); *Edwards v. Edwards*, No. W2011-02305-COA-R3-CV, 2012 WL 6197079, at *7, *11 (Tenn. Ct. App. Dec. 12, 2012) (affirming awards of transitional alimony of $250 per month for three years as well as alimony in futuro of $1,028, noting that the husband would effectively be paying $1,278 in the first three years to cover the wife's deficit until she was closer to eligibility for social security); *see also Watson v. Watson*, 309 S.W.3d 483, 500 (Tenn. Ct. App. 2009) (modifying a trial court's alimony award to include an award of alimony in futuro upon termination of the transitional alimony award).[23]  Thus, we do not conclude that an award of both types was impermissible. However, as with any other type of award, it must be warranted in light of Wife's need and Husband's ability to pay.  Husband argues that he has effectively paid all the transitional alimony he should be required to pay by maintaining both households through the conclusion of the divorce proceeding.  He notes that he continued paying the expenses for the marital home even after he moved from the marital residence in 2020.  Given the amount of support Wife has already received, Husband argues that his obligation to pay

---

[23] We also note this Court's decision in *Diffie v. Diffie*, No. M2018-00267-COA-R3-CV, 2019 WL 1785683, at *1 (Tenn. Ct. App. Apr. 23, 2019), in which a trial court awarded all four types of alimony. We explained that the alimony statute provides that the court may award any of the four types of alimony "'or a combination of these, as provided in this subsection (d).'"  *Id*. at *10 (quoting Tenn. Code Ann. § 36-5-121(d)(1)).  However, subsection (d) stated that "'[t]ransitional alimony is awarded when the court finds that rehabilitation is not necessary, but the economically disadvantaged spouse needs assistance to adjust to the economic consequences of a divorce[.]'"  *Id.*  Therefore, "these two distinct categories of support" have "differing roles," we explained.  *Id.*  Because transitional alimony is awarded when rehabilitation is not necessary, we concluded that the wife could "not receive both transitional alimony and rehabilitative alimony."  *Id.*  However, for the remaining three awards, we proceeded to consider the amount of alimony awarded.  *Id.* at *12.  The trial court awarded the wife transitional alimony of $4,000 per month for a maximum of 54 months "to assist with the mortgage payment" and alimony in futuro of $2,000 per month beginning on payoff of the mortgage debt, as well as additional alimony in futuro for her health insurance not to exceed $1,000 per month.  *Id*.  We reversed these awards of alimony in futuro and transitional alimony and remanded for the trial court to make additional findings of fact and conclusions of law to determine Wife's need and Husband's ability to pay.  *Id.* at *14.

temporary support should be deemed "fulfilled" and that Wife does not need continued temporary support from him.

We note that Husband does not argue that the trial court should have required the immediate sale of the marital home. He simply argues that he should not have been required to pay the associated transitional alimony. In light of the fact that both Husband and Wife already have a monthly deficit of roughly $1,000 in the year after the divorce, even with our modification on appeal, we agree that shouldering Husband with an additional $1,000 per month in transitional alimony is clearly unreasonable. Husband sought to sell the marital residence several months prior to trial, beginning in February 2021. Wife opposed the motion. At trial, she testified that she only wanted to keep the house until their son graduated, which was also when, she acknowledged, she would consider the possibility of moving to Knoxville where her paramour resided. Due to the interest-only mortgage payments the parties made throughout the marriage, the cost of maintaining the marital home was extremely high, with a mortgage payment that ranged between $3,000 and $3,500 per month during the divorce proceeding. As the trial court found, "the current mortgage [] is $1000.00 more than Wife expects to pay for rent or mortgage when she leaves the home." They had no equity in the home. Considering Wife's insistence on remaining in the home at such an expense, the length of time that Husband was required to continue paying the mortgage and virtually every other expense during the divorce proceeding, and Husband's monthly deficit in the year after the divorce, he should not bear the entire additional expense for Wife to remain in the marital home. Therefore, we modify the transitional alimony award to $500 per month, essentially requiring both parties to equally share the burden of the extra cost. *See Tittle v. Tittle*, No. M2022-01299-COA-R3-CV, 2024 WL 314102, at *11-12 (Tenn. Ct. App. Jan. 29, 2024) (acknowledging that both parties had "an effective deficit" for the first four years but concluding that "Husband's transitional alimony obligation for the first two years, or a portion of that period during which he pays childcare expenses, creates a burden on Husband that appears greater than he is able to pay"); *Russell*, 2013 WL 6228164, at *7 ("We conclude that the trial court erred in setting the amount of transitional alimony beyond Husband's ability to pay and that a downward modification from $1,500.00 monthly to $1,000.00 monthly is appropriate and supported by the evidence in this case.").

### 6. Alimony in Solido

Finally, we consider Husband's separate issue regarding the award of $25,000 in alimony in solido, payable at $1,000 per month. Husband presents several very narrow arguments on appeal regarding this award. First, Husband argues that the trial court's ruling regarding attorney fees must be reversed and remanded due to the trial court's failure to consider any of the factors in the Tennessee Rules of Professional Conduct, Tenn. Sup. Ct. R. 8, RPC 1.5(a). "Rule of Professional Conduct 1.5 sets forth the 'correct legal

standard' when assessing the reasonableness of a cost and fee request."[24]  *Donovan v. Hastings*, 652 S.W.3d 1, 9 n.13 (Tenn. 2022) (quoting *Wright ex rel. Wright v. Wright*, 337 S.W.3d 166, 169 (Tenn. 2011)).  "In terms of procedure, the trial court should develop an evidentiary record, make findings concerning each of the factors, and then determine a reasonable fee that 'depend[s] upon the particular circumstances of the individual case.'"  *Wright*, 337 S.W.3d at 185-86 (quoting *White v. McBride*, 937 S.W.2d 796, 800 (Tenn. 1996)).  Thus, in order "[t]o *enable appellate review*, trial courts should clearly and thoroughly explain the particular circumstances and factors supporting their determination of a reasonable fee in a given case."  *Id.* at 186 (emphasis added).  "This Court previously has remanded cases for reconsideration when a trial court has not followed this prescribed procedure."  *Thomas v. Smith*, 682 S.W.3d 213, 232 (Tenn. Ct. App. 2023); *see, e.g.*, *Greene*, 2023 WL 6619209, at *5-6 (vacating an alimony in solido award and remanding for findings regarding "the reasonableness of the amount of attorney's fees billed by Wife's counsel").  Accordingly, "[w]hen the trial court's order provides no indication that it considered the reasonableness of the fee or any of the RPC factors, the appropriate remedy is to vacate and remand for the trial court to make an express determination as to the reasonableness of the fees."  *Smith v. All Nations Church of God*, No. W2019-02184-COA-R3-CV, 2020 WL 6940703, at *5 (Tenn. Ct. App. Nov. 25, 2020).

However, this Court has also held that a party waives the issue of the reasonableness of an opposing party's attorney fee by failing to raise the issue before the trial court.  *See, e.g.*, *Burchfield v. Burchfield*, No. M2017-01326-COA-R3-CV, 2019 WL 2185513, at *19 (Tenn. Ct. App. May 21, 2019) ("Father did not object to the fees or request a hearing on the reasonableness of the fees before the trial court. We conclude, therefore, that Father waived this issue and may not raise it on appeal.").  For example, in *Baker v. Baker*, No.

---

[24]  The Rule provides:

(a) A lawyer shall not make an agreement for, charge, or collect an unreasonable fee or an unreasonable amount for expenses. The factors to be considered in determining the reasonableness of a fee include the following:
(1) the time and labor required, the novelty and difficulty of the questions involved, and the skill requisite to perform the legal service properly;
(2) the likelihood, if apparent to the client, that the acceptance of the particular employment will preclude other employment by the lawyer;
(3) the fee customarily charged in the locality for similar legal services;
(4) the amount involved and the results obtained;
(5) the time limitations imposed by the client or by the circumstances;
(6) the nature and length of the professional relationship with the client;
(7) the experience, reputation, and ability of the lawyer or lawyers performing the services;
(8) whether the fee is fixed or contingent;
(9) prior advertisements or statements by the lawyer with respect to the fees the lawyer charges; and
(10) whether the fee agreement is in writing.

Tenn. Sup. Ct. R. 8, RPC 1.5(a).

M2020-00374-COA-R3-CV, 2021 WL 287845, at *6 (Tenn. Ct. App. Jan. 28, 2021), a father requested a remand from this Court "to allow the trial court to consider the reasonableness of Mother's attorney fees," suggesting that her divorce fees were excessive. *Id.* We stated that we "need not [] consider Father's objections because he did not challenge the reasonableness of Mother's attorney fee at the trial level." *Id.* "Father waived the issue of the reasonableness of Mother's attorney fees by failing to raise the issue before the trial court." *Id.*

In this case, the trial court found that "there is no objection to the reasonableness of the fees but only as to who should be made to pay those fees." We agree that Husband failed to object to the reasonableness of the fees requested in the trial court. As such, on appeal, he has waived the issue of reasonableness of the fees requested. Thus, there would be no need to remand for the trial court to apply the factors to determine the "reasonableness" of the attorney fee under the facts and circumstances of this case. The alleged error by the trial court is harmless in any event. *See* Tenn. R. App. P. 36(b); *Feldman v. Tenn. Bd. of Med. Examiners*, No. M2010-00831-COA-R3-CV, 2011 WL 2536471, at *18 (Tenn. Ct. App. June 27, 2011) ("Because the alleged error would be harmless in any event, we will not consider the issue."); *see also Thomas v. Ken Smith Auto Parts*, No. E2022-00591-COA-R3-CV, 2023 WL 2575939, at *11 (Tenn. Ct. App. Mar. 21, 2023) (declining to vacate an award of attorney fees due to the trial court's failure to apply the RPC factors when a remand would "almost certainly" result in a larger award against the appellant and therefore the trial court's error was "harmless as to [the appellant]").

We now proceed to consider Husband's other arguments regarding the award of alimony in solido. *See Scherzer v. Scherzer*, No. M2017-00635-COA-R3-CV, 2018 WL 2371749, at *21 (Tenn. Ct. App. May 24, 2018) (considering whether an award of attorney fees was appropriate as alimony in solido, explaining that "Wife at no time waived her objection to the award of attorney's fees to Husband," she "merely waived any objection to the reasonableness of the amount of the fees requested"). Husband argues that the trial court's rationale for awarding attorney fees to Wife "is not well-founded." The trial court's explanation for awarding alimony in solido stated:

> Wife is also seeking attorney fees and litigation expenses in the nature of alimony *in solido* from Husband totaling approximately $60,000.00, plus all amounts incurred through the end of trial in this matter and there is no objection to the reasonableness of the fees but only as to who should be made to pay those fees. Wife has paid attorney fees in the approximate amount of $16,900[.]00 between her previous and current attorneys which she paid either through the marital funds or on a credit card which Husband would have paid the bill on. Wife still owes a considerable amount. At some point, Husband closed the parties joint marital bank account and Wife did not have access to marital funds; however, Husband did and paid $60,000[.]00 in fees

- 58 -

between his attorneys and financial expert and he paid $5,000 for Wife's expert with the marital funds. Husband was able to use the parties' marital funds to pay his attorney fees and Wife was not and the Court has established that Wife has a need and Husband has the ability to pay, however, the Court also considers the fact that Wife is also at fault for the divorce and Husband is paying the IRS debt from joint tax returns. Further, the Court has considered that part of fees incurred are attributed to protracted litigation caused by Husband's failure to comply and multiple motions that were filed compelling Husband to produce discovery which were granted, and attorney fees awarded in some and Husband filing a pleading requesting alimony to be paid to him despite knowing he was the primary breadwinner in the marriage. The Court shall award Wife alimony in solido for $25,000.00 to be paid by Husband at the rate of $1,000.00 per month.

First, Husband argues that the trial court unfairly blamed him for "protracted litigation" and that the record does not support the trial court's finding regarding motions to compel being granted with "attorney fees awarded in some." Husband states that he has attached to his brief an appendix that provides a "summary" of the "relevant trial docket," showing that Wife's attorneys filed six motions related to outstanding discovery. Husband's appended summary specifically states that in connection with one of the motions to compel and for sanctions, there was an "award of attorney fees reserved for hearing to be set by Wife, which was never held." However, Husband's brief states, "Many of these motions, responses, and orders related thereto pertain to discovery so are not in the technical record." Without the necessary information in the record, this Court simply cannot confirm Husband's assertion regarding whether the trial court erred in concluding that attorney fees were "awarded in some" of the orders. "'[I]t is the appellant's duty to prepare a record for our review that includes everything contained in the trial court record that is necessary for our examination of the issues presented on appeal.'" *Deloach v. Sahara Daycare Ctr., Inc.*, No. W2022-01695-COA-R3-CV, 2023 WL 8433798, at *5 (Tenn. Ct. App. Dec. 5, 2023) (quoting *McAllister v. Rash*, No. E2014-01283-COA-R3-CV, 2015 WL 3533679, at *8 (Tenn. Ct. App. June 5, 2015)). "To the extent that the absence of a full record precludes this Court from reviewing the appellant's issues, the trial court's ruling is presumed to be correct." *Id.*

Finally, Husband argues that the trial court "took Husband to task" because his attorney filed a pleading requesting alimony despite knowing Husband was the primary breadwinner during the marriage. Husband argues that his claim for alimony had no effect on these proceedings other than the isolated exchange during trial when Wife's counsel asked Husband if he "actually filed a pleading in this case asking the Court to award [him] alimony" despite the fact that he was the primary breadwinner. Although Husband pointed out that the pleading was filed by his attorney and that Husband was not himself a divorce attorney, Wife's counsel suggested that it should have been obvious that Husband was not entitled to alimony. Husband argues on appeal that he "never actively sought" alimony,

"it was apparently a foregone conclusion" to everyone that he was not lawfully entitled to alimony, and the trial court should not have awarded attorney fees "on the basis of an issue that was so inconsequential" and had "no rational relation" to the amount of fees incurred.

We agree with Husband's characterization of his alimony request as a relatively inconsequential issue in the overall context of the divorce proceeding. However, the fact remains that he did include the request in his complaint. Moreover, the trial court simply noted Husband's request for alimony as one example of the "protracted litigation" tactics used by Husband. We cannot say that the trial court abused its discretion in doing so. *See Solima v. Solima*, No. M2013-01074-COA-R3-CV, 2015 WL 1186251, at *6 (Tenn. Ct. App. Mar. 11, 2015) ("a trial court may consider a party's litigious nature in determining an award of attorney's fees"); *Gorbet v. Gorbet*, No. W2011-01879-COA-R3-CV, 2012 WL 4847090, at *13 (Tenn. Ct. App. Oct. 11, 2012) ("a trial court may base an award of attorney fees on a finding that the attorney fees incurred by one spouse were enhanced by the other spouse's litigious conduct or obstructive tactics"); *see also Gonsewski*, 350 S.W.3d at 114 (observing that "each party should bear the expense of his or her litigiousness").

Having considered and rejected Husband's limited arguments on appeal with respect to alimony in solido, we affirm the trial court's award.[25]

### D.    Attorney Fees on Appeal

Wife presented an additional issue regarding whether she should be awarded attorney fees on appeal "either as a frivolous appeal or pursuant to Tenn. Code Ann. § 36-5-103(c)." However, the corresponding section of her brief did not mention the frivolous appeal statute and only relied on section 36-5-103(c). When appellate attorney's fees are requested pursuant to Tennessee Code Annotated section 36-5-103(c), "which expressly permit[s] the court to exercise its discretion, the Court of Appeals should analyze any such request by exercising its discretion to determine whether an award to the prevailing party is appropriate." *Eberbach v. Eberbach*, 535 S.W.3d 467, 477 (Tenn. 2017). In exercising our discretion, we "consider various factors including the parties' economic circumstances and the prevailing party." *Berl v. Berl*, No. M2023-00558-COA-R3-CV, 2024 WL 1711966, at *8 (Tenn. Ct. App. Apr. 22, 2024). Given Husband's success on appeal in achieving reduction of his alimony in futuro and transitional alimony obligations, and both parties' financial circumstances, we decline to exercise our discretion to award Wife her attorney fees. *See Levy*, 2024 WL 3747842, at *10.

---

[25] Husband's brief also included a footnote in this section in which Husband argued that the trial court's allowance of testimony regarding what occurred during mediation "should constitute prejudicial reversible error." He conceded that the trial court did not mention this issue in its discussion of the award of attorney fees but suggests that the court "may have considered" the testimony nonetheless. Because this argument is merely mentioned in a footnote, we decline to address it. *See Charles v. McQueen*, 693 S.W.3d 262, 273 (Tenn. 2024) ("Arguments raised only in footnotes are waived.").

## IV. Conclusion

For the aforementioned reasons, the decision of the circuit court is hereby vacated in part and affirmed as modified. Costs of this appeal are taxed equally to the appellant, James Edward Blount, and to the appellee, Heather Danielle Blount, for which execution may issue if necessary.

_____
CARMA DENNIS MCGEE, JUDGE